[Sac. No. 7793. In Bank. Mar. 21, 1967.]

JOHN F. WALLER, Plaintiff and Respondent, v. SOUTHERN PACIFIC COMPANY, Defendant and Appellant.

Diepenbrock, Wulff & Plant and Robert R. Wulff for Defendant and Appellant.

Colley & McGhee and Nathaniel S. Colley for Plaintiff and Respondent.

MOSK, J.—Defendant appeals from a judgment in favor of plaintiff entered on a jury verdict in a personal injury action brought under the Federal Employers' Liability Act (hereinafter called F.E.L.A.).

Defendant maintains that the evidence is insufficient to justify the conclusion either that defendant was negligent or that its negligence played any role in aggravating plaintiff's preexisting condition; that hypothetical questions propounded to plaintiff's expert were not accurate statements of the record and contained facts contrary thereto; that the court erroneously instructed the jury on the applicable test for determining defendant's liability under the F.E.L.A.; and that the court erroneously refused to limit the charge of negligence to the ''proper'' time period. We have concluded that these contentions lack merit and that the judgment should be affirmed.

Inasmuch as an attack has been made upon the sufficiency of the evidence, we shall briefly summarize the facts viewed in a manner most favorable to the plaintiff, who prevailed below, as required on appellate review. (See *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384]; *Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Laymon* v. *Simpson* (1964) 225 Cal.App.2d 50, 52 [36 Cal. Rptr. 859].)

Plaintiff had been employed as a train dispatcher for defendant Southern Pacific Company and other railroads since 1942. After 1954 he worked in defendant's Sacramento office on the 4 p.m. to midnight shift. In 1950 he entered the Southern Pacific Hospital in San Francisco, suffering from sharp chest pains which radiated into his arms. The hospital

record notes enlargement of the heart, mild coronary insufficiency, normal heart sounds, an ulcer possibility, plus spasms of the cardiac sphincter (a portion of the digestive tract). A 1958 entry in the hospital records included a diagnosis of hypertensive vascular disease. In May 1959 a private physician suggested a thorough examination at the Southern Pacific Hospital. Plaintiff was admitted to the hospital and placed under the care of Dr. Bradford Simmons, a general surgeon. A diagnosis of general arteriosclerosis was made. A bilateral sympathectomy was performed in the hope of relieving arterial constriction in his legs.

A rule of the railroad prevented any hospitalized employee from returning to work without medical authorization. Plaintiff was discharged from the hospital on June 2, 1959, with a certificate evidencing his "fitness for duty." He resumed his work as a train dispatcher on June 8, 1959.

The job required plaintiff to issue and record orders for the movement of all trains in an assigned area. There was evidence, both lay and medical, justifying the jury conclusion that the position was exacting and exposed its occupant to tension and emotional stress.

In November 1961 plaintiff returned to the Southern Pacific Hospital for a checkup. He complained of severe chest pains occurring after exercise. Although testing and subsidiary diagnoses appear to have been conducted by other doctors, Dr. Simmons and Dr. Charles J. Monahan, also a general surgeon, were primarily responsible for his diagnosis and treatment. The doctors concluded that the patient had definite coronary artery insufficiency; that he had angina pectoris symptoms, caused by a worsening of the arteriosclerotic condition, and that he could not safely return to work. In December 1961 plaintiff was informed by the company that he would not be restored to duty as a train dispatcher without permission of the chief surgeon at the Southern Pacific Hospital. This permission was not forthcoming.

The instant suit was tried on the theory that it was negligence for defendant to conceal from plaintiff the true nature of his illness, informing him prior to 1959 only that he was suffering from an upset in his digestive system when in fact he also suffered from cardiovascular disorders. Negligence was also predicated on the assignment of plaintiff to duties between 1959 and 1961 which defendant knew, or should have known, would aggravate his condition.

██ At the threshold it must be emphasized that substantive state law is inapplicable to litigation based upon the F.E.L.A. (see *Garrett* v. *Moore-McCormack Co.* (1942) 317 U.S. 239, 244 [67 L.Ed. 239, 63 S.Ct. 246]), and that the question of sufficiency of the evidence is controlled by federal law. (*Davee* v. *Southern Pac. Co.* (1962) 58 Cal.2d 572, 576 [25 Cal.Rptr. 445, 375 P.2d 293].)

In *Rogers* v. *Missouri Pac. R.R. Co.* (1957) 352 U.S. 500, 506-507 [1 L.Ed.2d 493, 77 S.Ct. 443], the Supreme Court set out the applicable standards for review in an action under the F.E.L.A.: ''Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part*' to its negligence. (Emphasis added.) '' The court went on to point out, ''for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury . . . which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference.'' (*Id.* at p. 508.)

More recently the Supreme Court has said: ''It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and

inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. *Washington & Georgetown R.R. Co.* v. *McDade,* 135 U.S. 554, 571, 572 [34 L.Ed. 235, 10 S.Ct. 1044] ; *Tiller* v. *Atlantic Coast Line R.R. Co., supra,* 68 [318 U.S. 54 (87 L.Ed. 610, 63 S.Ct. 444, 143 A.L.R. 967)]; *Bailey* v. *Central Vermont Ry. Co.,* 319 U.S. 350, 353, 354 [87 L.Ed. 1444, 63 S.Ct. 1062]. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. *Courts are not free to reweigh the evidence* and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'' (Italics added.) (*Gallick* v. *Baltimore & Ohio R.R. Co.* (1962) 372 U.S. 108, 114-115 [9 L.Ed.2d 618, 83 S.Ct. 659], quoting from *Tennant* v. *Peoria & P.U. Ry. Co.* (1943) 321 U.S. 29, 35 [88 L.Ed. 520, 64 S.Ct. 509].)

These and numerous other pronouncements of a similar nature induced the Court of Appeals for the Seventh Circuit to suggest that ''Under the recent decisions of the United States Supreme Court in F.E.L.A. cases, speculation, conjecture and possibilities suffice to support a jury verdict.'' (*Gibson* v. *Elgin, Joliet & Eastern Ry. Co.* (7th Cir. 1957) 246 F.2d 834, 837, cert. denied, 355 U.S. 897 [2 L.Ed.2d 193, 78 S.Ct. 270] ; but see memorandum of Mr. Justice Frankfurter (*ibid.*).) We need not adopt the somewhat cynical position suggested by the court in *Gibson,* since under the test enunciated in *Rogers* v. *Missouri Pac. R.R. Co.* (1956) *supra,* 352 U.S. 500, 506-507, there is sufficient evidence in the record here to support the jury's verdict.

Detailed in the margin are the relevant portions of a series of hypothetical questions propounded by plaintiff to his expert, Dr. Abraham McIntosh, and the doctor's answers thereto.[1] It is readily apparent from a reading of these

---

[1] ''Q. Well, let's see, can we put some of these factors which are already into evidence, into one general hypothetical question, Doctor, and I tell you in advance it's going to be rather long in order to put it, try to tie it all together. Assuming that about a year and a half after you found the patient with a heart fifteen percent larger than it was expected to be, you examined him and found it ten millimeters larger than it was before, and assuming further that on the second examination, the patient gave a complaint of pain in the chest, radiating into the shoulders and into both arms, but more on the left than on the right; and assuming further that on the second examination an electrocardiogram was suggestive

questions and answers that the jury could have inferred therefrom it was reasonably foreseeable that a person with plaintiff's symptoms and condition would have the symptoms and condition aggravated by assignment to a job involving great responsibility, stress and tension. The interrogation also reveals the doctor was of the opinion that if the duties of

of left coronary insufficiency; and assuming further after the completion of the examination, a year and a half later, your prognosis was guarded for eventual outcome. Would you have an opinion whether it would be reasonably foreseeable that the assignment of such a person to a job requiring great responsibility, stress and tension, would aggravate his condition?

"A. I would say this certainly would, with all of these findings, would show that he did have heart disease, and when you do have this type of problem, anything that would aggravate would just make the condition even worse.

"Q. Assuming, in addition to what we have said heretofore, that this same patient was seen in 1959, in May, and assuming further that he was still complaining of chest pains; assuming further that you found in 1959 that he had arteriosclerosis to such an extent that you'd have to do a sympathectomy to prevent pain in his legs; and assuming further that the complaint of pain in the chest has not subsided but still recurs; would you have an opinion as to the fitness of that person to do a job requiring stress and tension on a constant eight-hour basis, five days a week, and even assuming further that this requirement was even without lunch hour or other break. Would you have an opinion as to the probability of that schedule aggravating or worsening the condition which you had found to exist?

"A. Well, these—this—anything that would aggravate here, I would say yes, that this person certainly should not be placed in—in areas where he would be under tension, because persons who have coronary insufficiency usually are candidates for sudden death because of heart failure. And over this period of time, this person would be more and more susceptible to the problem of sudden death from coronary insufficiency.

"Q. Would the assignment of such a person to a position requiring him to remain under tension, have a tendency to aggravate or hasten any fatal result or outcome, or total disability from cardiac insufficiency?

"A. Oh, yes, because the more insults the heart—the more insult to the heart, the more rapid its deterioration.

"Q. Can you tell us, Doctor, why tension would tend to accelerate or hasten the breakdown or even the fatal result here? What's the mechanism of the tension with relation to the heart? How does it do the harm? Why?

"A. Well, there is a person that's tense. His body functions are just not—it's an abnormal function in that the heart beats faster, he breathes more rapidly, there is some spasm of the blood vessels that have to be overcome by the work of the heart. All of these things combine to put more work on the heart and even on the body musculature itself in situations where there is a repeated external stimuli.

"Q. Now, Doctor, would the duration of the tension have anything to do with it? What about tension which lasted eight hours a day?

"A. Well, this would be more than an hour—because here, the number of the variations of types of stimuli, over a short period of time, would be less insults than over a longer period of time.

"Q. In other words, the longer one would have to stay under tension and stress without interruption, would be a factor in hastening the eventual breakdown; is that right?

train dispatcher would make plaintiff's condition worse in 1961, as defendant's doctors admitted both by a letter discussed hereinafter and by direct testimony, those same

"A. Yes, especially in some of these patients who have coronary insufficiency, they will still develop a collateral circulation at times and get along pretty good if they don't—if there can be a balance of destruction as well as buildup. If there is some balance between the two, a lot of them get along real well.

"Q. Well, assuming for the moment that the patient with the conditions that we have been talking about, was in 1959, in May of 1959, after the sympathectomy we have talked about and after there had been a prognosis reading 'guarded for eventual outcome' was returned to work as a train dispatcher, and this job required constant attention to train schedules to prevent the possibility of trains running together, seeing to it that each train went the direction it was supposed to go, and doing this kind of thing on a sustained eight-hour basis without interruption, would you have an opinion as to whether that work itself, assuming that it's constant and under tension and stress, would tend to hasten or accelerate or aggravate the man's condition so that he would be at a point where he could not work as a useful employee at all?

"A. Yes. Because a damaged heart and repeated stress in situations as you described, would certainly help, or help in the—accelerate the deterioration of his heart.

"Q. All right. Now let's go back to the period of 1959 in particular, and consider the—well, withdraw that. Doctor, let's assume for a minute that in 1959, the condition was such that a sympathectomy was performed, and assuming further that at that time the persons performing it had knowledge of prior coronary difficulty, I want you to look at two sets of medical records. One is Plaintiff's Exhibit No. 5 and it's the hospitalization summary for May 17, 1959, and the other one is for the period of November to December, 1961. And ask you to take a moment to look at those with special reference to the heart and arteries, or the cardiovascular findings, and what I really want to know is, whether or not, assuming that it was dangerous to send this man back to train dispatching in November, was it also dangerous in May of 1959? . . . Now my question is, assuming that you held this opinion in December of 1961, and I want to read to you the opinion that I am asking you to assume that you held in '61. Assuming that you felt 'that the occupation is one which has a great responsibility and emotional stress involved, and it is felt that to continue this occupation it might aggravate the condition or even endanger the life,' now assuming that that opinion was held in November or December of 1961, I want to know, do you have an opinion as to whether or not there is anything in any of the records to indicate that that opinion should not have been expressed in May of 1959? In other words, if it would have hurt him in November of 1961, is there anything to indicate that it wouldn't also hurt him in May of '59?

"A. No, there isn't. Because the same diagnosis was made in 1959 of arteriosclerotic cardiovascular disease with intermittent claudication. The heart was involved and so were the legs. And in 1961 the diagnosis was the same, of generalized arteriosclerosis, coronary insufficiency, peripheral vascular insufficiency, psoriasis, and high blood pressure. The same things existed in '59 as existed in 1961.

"Q. Now, Doctor, we have in evidence a letter from Dr. Charles A. Monahan and introduced as Plaintiff's Exhibit 7, wherein he expresses the opinion that the condition that Mr. Waller has would make it impossible for him to do the job as a train dispatcher with safety, because he said it had great responsibility and emotional stress, and that if he

duties would have also injured him between 1959 and 1961. From this the jury could have inferred that defendant was negligent in reassigning plaintiff to his work in 1959.

Defendant contends that the hypothetical questions asked of plaintiff's expert were not an accurate reflection of the record. Determination of the propriety of hypotheses is often difficult. In the instant context the questions propounded to Dr. McIntosh were based upon voluminous medical records from defendant's Southern Pacific Hospital. Obviously, no intelligible hypothetical question could include every notation from each page of a detailed record covering eight periods of hospitalization. Our examination of the record indicates that any omissions or errors in the questions as propounded were inconsequential.

Moreover, in our adversary system we take cognizance of the possibility that in framing a complex hypothetical question counsel may inadvertently omit or even misstate a significant fact and thus elicit an inappropriate opinion from an expert. It is for this reason that opposing counsel is permitted to object and point out errors contained in a proposed hypothetical question, thereby affording the propounder an opportunity to reframe his query. In the instant case, however, counsel for defendant made no objections at the time these questions were asked. Further, defendant's cross-examination of Dr. McIntosh was not designed to expose any improper assumptions underlying the doctor's previous answers. Defendant's failure to object at trial thus deprived plaintiff of the opportunity to correct any errors there may have been in the questions, if he could do so consistent with the state of the record, and it therefore may not raise the issue for the first time on appeal. We need not consider the effect of a failure to object if the hypothetical questions were almost entirely based on facts not in evidence or on misstatements of fact (see *Kitchel* v. *Acree* (1963) 216 Cal. App.2d 119, 124 [30 Cal.Rptr. 714]), as such is not the situation here. However, we note that some courts have sternly refused to permit the issue to be raised for the first time on

---

continued to do it, it would aggravate his condition or even endanger his life. Do you agree with that opinion?

"A. Yes, I do. Because these patients who have angina pectoris, this is subject to sudden death from cardiac failure.

"Q. And do you have an opinion as to whether or not to return him to work in May of 1959 or June of 1959, would also aggravate his condition or endanger his life?

"A. Yes, I think with the evidence here of abnormality of the heart due to arteriosclerosis, this certainly would have.''

appeal even under extreme circumstances. (See, e.g., *Rics* v. *Reinard* (1941) 47 Cal.App.2d 116, 121-122 [117 P.2d 386]; *Matthiesen* v. *Smith* (1936) 16 Cal.App.2d 479, 482 [60 P.2d 873].)

Defendant argues that whatever "condition" was worsened, the only risk increased by its negligence was that of a heart attack, an injury which did not in fact occur; thus, it is urged, plaintiff suffered no compensable damage. However, a fair reading of the hypothetical questions put to Dr. McIntosh on direct examination supports an inference that the assignment of plaintiff to work as a dispatcher in 1959 worsened his arteriosclerotic condition, causing increased pains of angina pectoris and rendering him unfit for further employment by defendant in 1961. Certainly this same inference must have been drawn from the doctor's testimony by counsel for defendant, since on cross-examination he questioned Dr. McIntosh on these subjects.[2]

Even more telling is a letter written to plaintiff's wife in January 1962 by Dr. Monahan, one of defendant's witnesses, and approved by defendant's chief surgeon. The letter stated in part: "Our findings indicated that your husband was suffering from generalized *arteriosclerosis*, which is a hardening and narrowing of the arteries. The vessels in his legs and heart are the ones most involved. The pain he complains of in his chest is commonly called angina, and indicates that under these conditions the heart is not getting enough nourishment. Your husband's occupation is one which has a great deal of responsibility and emotional stress involved, and it was felt that to continue this occupation, *it might aggravate his condi-*

---

[2] "Q. Now when a person who has progressive arteriosclerosis, if he is subjected to unusual physical exercise or exertion or unusual emotional distress, is the risk there of cardiac insufficiency?

"A. Well, we will have to qualify it just this deal, because there can be arteriosclerosis and it doesn't have to be generalized, or it just can affect certain areas. Now—

"Q. My question assumes the generalized arteriosclerosis.

"A. Well, if he had arteriosclerosis of the heart, well then this would —these things would affect him.

"Q. Doctor, is there, to your knowledge, any proven medical theory that the subjecting of a man to severe emotional distress, will aggravate the condition of his arteriosclerosis?

"A. Well, there was—I can cite an article, I don't know where it is right now, but of generals in the Air Force that they noticed that they had very high blood cholesterols when they kept them around the Pentagon, but when they sent them out in some other areas where they were not under very much pressure, then the blood cholesterol went down. And we do say that high blood cholesterols are predisposing factors to development of arteriosclerosis."

*tion* or even endanger his life." (Italics added.) Although Dr. Monahan subsequently took the stand to deny that he meant plaintiff's arteriosclerotic condition could be worsened by his job, it would be reasonable for the jury to draw such a conclusion from the text of the letter.

 Defendant contends that the court erroneously instructed the jury on the test of an employer's liability under the F.E.L.A. The challenged instruction stated that "Under the Federal Employers' Liability Act the test to be applied in determining whether the railroad is liable is this: Do the facts, as established by the evidence justify with reason the conclusion that the negligence of the railroad played any part, however slight, in proximately causing the injury for which damages are sought."

At the outset, it must be conceded that the rhetoric of federal decisions on causation makes it difficult to prescribe affirmatively a form of instruction which would meet approval in all actions under the F.E.L.A.

Defendant relies on *Bertrand* v. *Southern Pac. Co.* (9th Cir. 1960) 282 F.2d 569, 572-573, cert. denied, 365 U.S. 816 [5 L.Ed.2d 694, 81 S.Ct. 697]. In that case the Court of Appeals disapproved a proposed instruction which would have advised the jury that "Under this act of Congress, the test of liability of the railroad carrier [that is, the defendant, Southern Pacific] is simply whether the proofs justify with reason the conclusion that the employer's negligence [in this case the failure to furnish an efficient hand brake] played any part, even in the slightest, in producing the injury for which damages are sought. It does not matter that from the evidence the jury may also with reason on grounds of probability attribute the result to other causes including the employee's contributory negligence."

While conceding that the proposed instruction correctly paraphrased the language to be found in *Rogers* v. *Missouri Pac. R.R. Co.* (1957) *supra,* 352 U.S. 500, 506, *Bertrand* noted that the Supreme Court in employing that language was not referring to "the test of liability of the railroad carrier," but to "the test of a jury case." More specifically, the court based its disapproval of the instruction on the following reasoning: "the fact that the proofs or evidence justify with reason a finding of causal relation does not mean that the jury is required to make such a finding. The proposed instruction is faulty because it bound the jury to find what it was

entitled to find but was not required to find." (*Bertrand* v. *Southern Pac. Co.* (9th Cir. 1960) *supra*, 282 F.2d 569, 573.)

We do not find *Bertrand* convincing. Apparently both that court and the defendant here would approve of an instruction which simply omitted the phrase, "justify with reason."[3] In the instant case, however, this appears to be a distinction without a significant difference. It would seem beyond dispute that a causal instruction derived from the language of the *Rogers* jury test is proper, and a substantial number of courts have so held. (See, e.g., *Ganotis* v. *New York Central R.R. Co.* (6th Cir. 1965) 342 F.2d 767, 768; *Ammar* v. *American Export Lines, Inc.* (2d Cir. 1964) 326 F.2d 955, 958-959; *Page* v. *St. Louis Southwestern Ry. Co.* (5th Cir. 1963) 312 F.2d 84, 87-92; *DeLima* v. *Trinidad Corp.* (2d Cir. 1962) 302 F.2d 585, 587-588; *Mangrum* v. *Union Pacific R.R. Co.* (1964) 230 Cal.App.2d 960, 965-966 [41 Cal.Rptr. 536]; *Najera* v. *Southern Pac. Co.* (1961) 191 Cal.App.2d 634, 647-650 [13 Cal.Rptr. 146]; *Strobel* v. *Chicago, Rock Island & Pac. R.R. Co.* (1959) 255 Minn. 201 [96 N.W.2d 195, 198-201]; *Brown* v. *Dougherty* (1964) 74 N.M. 80 [390 P.2d 665, 670-671]; *Continental Oil Co.* v. *Lindley* (Tex.Civ.App. 1964) 382 S.W.2d 296, 302-303.)

█ Further, it is settled that the instructions must be considered in their entirety, and if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though by selecting isolated passages from single instructions, they may in some respects be amenable to criticism. (*Peters* v. *Southern Pac. Co.* (1911) 160 Cal. 48, 69 [116 P. 400]; see also *Miner* v. *Dabney-Johnson Oil Corp.* (1933) 219 Cal. 580, 583 [28 P.2d 23]; *Philbrick* v. *Weinberger* (1964) 228 Cal.App.2d 681, 686-687 [39 Cal.Rptr. 617].) █ Thus even assuming the necessity for some reference to the preponderance of the evidence rule in the challenged instruction, no error is shown. The jury was admonished in two other instructions that a preponderance of the evidence was required to support a finding; and in still another instruction the term "proximate cause" was defined in a manner which many F.E.L.A. decisions would have deemed unduly conservative and thus beneficial to defendant.

---

[3] This issue should not recur, as the 1965 supplement to the California Jury Instructions, Civil, No. 301.10, rephrases the instruction and deletes the words, "justify with reason."

■ The court correctly instructed the jury as to defendant's liability for assigning an employee to a job for which he is medically unfit. In this regard the jury was told that "Under the Federal Employers' Liability Act, the word 'injury' may include sickness, and it is negligence for a railroad company to assign a sick employee, of whose illness it knew or should have known, to tasks for which he is, by reason of his condition, unfitted, and the employee may recover damages from the railroad if such assignment plays any part in proximately worsening or aggravating such condition." Defendant contends that this instruction is erroneous in that it omits the "essential element" that the defendant by its acts must have "forced" the employee to perform a task it knew or should have known to be injurious.

Defendant relies on *Dunn* v. *Conemaugh & Black Lick R.R.* (3d Cir. 1959) 267 F.2d 571, 575, and *Nuttall* v. *Reading Co.* (3d Cir. 1956) 235 F.2d 546, 549, in support of its contention that plaintiff must prove the management *forced* him into work which it knew or should have known he was unfit to perform because of his condition. However, cases both prior and subsequent to the foregoing have found this requirement satisfied by such diverse terms as "continued employment" (*Brown* v. *Pennsylvania R.R. Co.* (W.D.Penn. 1960) 179 F.Supp. 858, 862), "directing" (*Bascho* v. *Pennsylvania R.R. Co.* (1949) 3 N.J.Super. 86 [65 A.2d 613, 616]; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Waterhouse* (Tex.Civ.App. 1949) 223 S.W.2d 654, 659), and "assigning" (*Bayles* v. *Louisville & Nashville R.R. Co.* (1961) 272 Ala. 188 [129 So.2d 679, 680]; see also *McMillan* v. *Western Pac. R.R. Co.* (1960) 54 Cal.2d 841 [9 Cal.Rptr. 361, 357 P.2d 449]; *McGuigan* v. *Southern Pac. Co.* (1954) *supra,* 129 Cal.App.2d 482 [277 P.2d 444]). Thus in the instant case a jury instruction couched in terms of "assignment" appears to have been proper.

Moreover, even if we were to assume *arguendo* that the element of force or coercion was essential to plaintiff's theory, it would seem that in a very real sense defendant did "force" plaintiff to perform work which it knew or should have known to be deleterious to him, by concealing from him the true nature of his condition and the possible adverse effect of such duties upon his condition of health.

■ Contrary to defendant's contentions, there was adequate evidence to submit this issue to the jury. Defendant's agents, the doctors of the Southern Pacific Hospital, certified

plaintiff to be fit for his job as a dispatcher after hospitalization in 1959. As pointed out above, there was sufficient evidence that the doctors knew at that time, or should have known, that continued work as a dispatcher would be injurious to plaintiff. Since there was also evidence that the effect of the issuance of a certificate of fitness for work is tantamount to automatic reassignment of the employee to his former position, the evidence on the question of negligent reassignment is compelling.

Nor did the court err in refusing defendant's proposed instruction limiting the charge of negligence to the period from June 8, 1959, to November 24, 1961. The record reveals that on two separate occasions the court gave at defendant's request the following instruction, which adequately covers the point: "Inasmuch as a cause of action accrues in a case such as this when the claimed accumulated physical effects of the plaintiff's employment as a dispatcher manifest themselves to the plaintiff, if you find that prior to July 4, 1959, the claimed accumulated effects of the plaintiff's employment, as a dispatcher, were manifest to the plaintiff, then you must find for the defendant as to any claimed negligence of defendant occurring on or before that date, inasmuch as the complaint was filed herein on July 5, 1962. Even if you find that plaintiff's cause of action accrued prior to July 4, 1959, plaintiff may nevertheless recover damages for any aggravation of his condition which occurred on or after July 4, 1959, provided that you find such aggravation was a proximate result of defendant's negligence, if any, in continuing the plaintiff in employment."

Moreover, the period of possible negligence need not be limited to the time urged by defendant. While the pleadings circumscribed the negligence to a somewhat different period than that adduced by the evidence, it is well settled that "A variance between the allegations of a pleading and the proof will not be deemed material unless it has actually misled the adverse party to his prejudice in maintaining his action or defense on the merits, and a variance may be disregarded where the action has been as fully and fairly tried on the merits as though the variance had not existed." (*Hayes* v. *Richfield Oil Corp.* (1952) 38 Cal.2d 375, 382 [240 P.2d 580]; see also *Treu* v. *Kirkwood* (1954) 42 Cal.2d 602, 608 [268 P.2d 482]; *Frazier* v. *Yor-Way Market, Inc.* (1960) 185 Cal.App.2d 390, 399 [8 Cal.Rptr. 335]; *Pacific Atlantic Wine, Inc.* v. *Duccini* (1952) 111 Cal.App.2d 957 [245 P.2d 622].)

At the commencement of this trial, plaintiff sought to amend the pleadings to expand the chronological limits surrounding the alleged acts of negligence. Although the trial court denied the motion at that time, it stated it would permit plaintiff to make "other motions to amend in conformity with the proof" at an appropriate time. Moreover, the court indicated its intention to permit plaintiff to bring in evidence of his condition relating to a period in accord with his proposed amendment, and such evidence was duly introduced. The medical information pertaining to these acts of negligence was uniquely within the knowledge of defendant. Finally, defendant vigorously cross-examined plaintiff's witnesses and produced its own evidence on the very issues which it contends were not raised by the pleadings. If anything, defendant's actions throughout the trial and its continued insistence that the issue was not presented by the pleadings indicate that it was fully aware that the court's rulings would permit recovery for the disputed period, and hence the variance may be disregarded as immaterial. (*Hayes* v. *Richfield Oil Corp.* (1952) *supra,* 38 Cal.2d 375, 382.)

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.