[Civ. No. 13539. Fourth Dist., Div. Two. Sept. 18, 1975.]

ALFREDO L. VALDEZ, Plaintiff and Appellant, v.
J. D. DIFFENBAUGH COMPANY et al., Defendants and Appellants;
LIBERTY MUTUAL INSURANCE COMPANY,
Intervener and Appellant.

## COUNSEL

Tom Eckhardt, Bob Youmans, Jim Gallion, C. L. Vineyard and Marshall Miles for Plaintiff and Appellant.

Thompson & Colegate, Amil Roth, Bruggeman & Smith, Cyrus J. Lemmon, King & Mussell and Ronald A. Burford for Defendants and Appellants.

Morgan, Wenzel & McNicholas, Dennis J. Sinclitico and Bruce Broillet for Intervener and Appellant.

## OPINION

**KERRIGAN, J.**—A production worker ("plaintiff") employed by a pipe manufacturing concern sustained severe personal injuries when he was caught and crushed between a huge piece of pipe and an oven door. The pipe was traveling on a conveyor as it approached the door. It was held in place at each end by a cart. The carts moved along the production line on tracks, pulled by a chain, with the chain being situated between the tracks. The employee was either traveling on the front cart or passing in front of it just before the accident. The carts failed to stop and the oven door failed to open, resulting in serious injuries to the employee's pelvis, back and left leg.

The employee collected workmen's compensation benefits from his employer's compensation carrier. He also filed an independent action against three firms: the oven supplier, the conveyor system supplier, and the general contracting firm ("defendants") which built the plant and which also made repairs and modifications on the conveyor and oven.

The lawsuit was predicated on three theories: negligence, warranty and strict liability in tort ("products liability"). The employer's workmen's compensation carrier ("intervener") intervened in the action for the purpose of recovering the benefits it had advanced to the injured employee. The court instructed the jury on the theories of warranty and strict liability as to the two suppliers and the contractor. Negligence was an issue as to the contractor only. The jury returned a general verdict

against all three firms for $350,000; in addition, the jury made the following special findings:

*Special Finding No. 1:*

"Was United Technology Center [plaintiff's employer] negligent? Yes."

"If you have answered the question one in the affirmative, question two: Did that negligence concur with the negligence of Defendant Diffenbaugh [the repairer] as a proximate cause of the injuries and damages suffered by the Plaintiff? No."

*Special Finding No. 2:*

"Did United Technology Center [plaintiff's employer] assume the risk of harm from a defect in the product causing injury to the Plaintiff? No."

*Special Finding No. 3:*

"Was . . . [plaintiff's employer] a manufacturer or designer of the equipment alleged to be defective in this case? No."

The three defendants made motions for judgment notwithstanding the verdict and for a new trial. The court denied the motions for judgment notwithstanding the verdict. However, the court granted the motion for a new trial of the oven supplier (Beattie) and the conveyor installer (Minder); the court also stated that it would be inclined to grant the contractor's motion for new trial on the theories of warranty and products liability but inasmuch as there was sufficient evidence to sustain the verdict against the contractor on the basis of negligence, the contractor's motion for a new trial was denied.

The contractor appeals from the judgment. The injured employee and the employer's compensation carrier appeal from the order granting the suppliers' motions for a new trial. In turn, the suppliers cross-appeal from the judgment as originally entered.

We have determined that the $350,000 judgment against the contractor should stand; that the trial court properly denied the judgment n.o.v.; and that the order granting the suppliers a new trial be affirmed.

FACTS

United Technology Center ("UTC"), a subsidiary of United Aircraft, developed a new process for manufacturing pipe and constructed a pilot plant at Sunnyvale for the purpose of testing the process. As a result of the Sunnyvale experiment, company officials evidently felt that the new process had great promise. Accordingly, a corporate decision was made to build a production plant at Riverside. UTC utilized its own personnel and various independent contractors in designing the Riverside plant. It then retained J. D. Diffenbaugh Co. ("defendant") as general contractor to build the factory.

Pipe is composed of many substances such as resin, fabric and sand. While UTC's precise methods of making pipe constitute trade secrets, a motion picture of the Riverside production line was shown in the trial court[1] and the court and jury were thus provided with a general view of operations at the Riverside facility.

The resinous pipe material, mixed with strands of fabric and sand, is wrapped and coated around a long, solid metal core or rod. This core or rod is called a "mandrel" and inasmuch as the liquid material is applied over the core, the size of the mandrel governs the size of the pipe to be made.[2] After the soft, liquid wrapping is applied, it is necessary for the large, heavy mandrels to be carried by carts from the start of the production line to the ovens for hardening or molding.

Consequently, UTC decided to install a chain-drag conveyor system (one somewhat similar to the type used in automatic car washes) for the purpose of carrying the mandrels from the initial stages of production through the curing process.[3] Tracks (like railroad or trolley tracks) were built on each side of the chain. These rails accommodated the mandrel carts. Two carts were used to carry the mandrel—one on each end. Mandrel carts have wheels and are equipped with a type of "tongue" or "hook" which, when placed in a down position and attached to a "dog" or pin in the chain, furnish movement of the carts and mandrels from place to place during the production process. The cart could be stopped simply by lifting the tongue or hook off the chain and motive power thereby ceased.

---

[1] This court also viewed the film at the request of the parties.

[2] Some of the pipe manufactured by UTC was as large as 54 inches in diameter.

[3] The Sunnyvale pilot plant had *not* utilized a chain-drag conveyor system; the mandrel carts were pushed manually by the workers.

UTC ordered the conveyor system, the carts, and the hooks from J. W. Minder Chain and Gear Co. ("defendant"). The system was installed by Minder after Diffenbaugh finished the plant.

The curing ovens through which the conveyor system and carts ran were furnished and installed by Beattie Metal Products, Inc. ("defendant") after the plant was built. These ovens were long chambers through which the conveyor chain moved through a slot in the floor. The ovens were large enough to accommodate two long pipes. At each end of the oven were doors which opened and closed, on the guillotine principle, by use of a manual control. The doors and control system were also furnished and installed by Beattie.

When the conveyor was installed by Minder, there was a mechanical cam to stop the cart about two feet from the oven door whenever the oven door was in a closed position. When the door was in the down position and the blade of the door rested on the floor, the mechanical cam was situated in a lifted position where it would disengage or delatch the cart hook when the front cart reached the point of the cam. However, the mechanical cam would not work if the oven door was not completely closed or if the hooks on the cart were bent.

During the first few months of production, there were many "bugs" in the production line. The mandrels and carts were colliding with the closed oven doors at several points throughout the plant; the hooks on the carts were bending; the oven doors were not closing flush with the floor; and the mechanical cams in front of the oven doors were not functioning properly. In fact, the conveyor system and cart utilized in conjunction with oven No. 4 (the one involved in this accident) did not operate properly in that the mandrel carts would not move automatically through the conveyor system towards oven No. 4 unless someone stood on the hook on the front of the cart ("rode the cart") to maintain the necessary pressure for the drag conveyor to move the cart and its load.

Instead of recalling Minder for the purpose of repairing the bent metal hooks or Beattie for the purpose of correcting the oven doors and mechanical cams, UTC decided to recall the general contractor, J. D. Diffenbaugh Co., for the purpose of effecting the repairs. Diffenbaugh furnished UTC with iron workers and millwrights on an hourly basis for that purpose. UTC supervisory personnel advised the iron workers and millwrights what the problems were and what had to be done.

In addition to building the plant, Diffenbaugh had done some of the initial construction of the conveyor as a subcontractor of Minder. However, most of Diffenbaugh's work on the conveyor and ovens was performed after the ovens and conveyor were installed. Diffenbaugh's employees reworked the carts, replaced hooks, removed, installed and replaced oven doors, worked on the limit switches and repaired the conveyor chain. Diffenbaugh installed an air-actuated cam a few feet in front of the oven door of oven No. 4 and also installed a fail-safe device on the oven door itself. The fail-safe consisted of an inclined plane of metal up which the mandrel cart hook would theoretically ride, upon the car arriving at the oven door, and would, thus, disengage the hook and stop the forward progress of the carts and mandrels.

The accident happened on February 7, 1969—about five months after the start of production. Immediately prior to being crushed, Valdez ("plaintiff") was either "riding the cart"[4] or was walking across the conveyor between the cart and the oven for the purpose of actuating the oven control switch. The evidence is clear that at the time of the accident neither the air cam nor the fail-safe device worked. The oven door remained closed and the mandrel cart failed to stop, crushing the plaintiff between the cart and the oven door. Valdez had no prior knowledge that carts had failed to stop on past occasions when the oven door was closed.

The hook on the front cart went under the oven door. For this to have occurred, the door must not have closed all the way down; if the door was one and one-half inches off the ground, the fail-safe device would not delatch the hook; thus, it may be inferred that one cause of the accident was an improperly adjusted door; another probability is that inasmuch as the air-actuated cam was located in front of the oven door, for the hook to get under the door, there had to be some malfunction of the cam.

An expert (industrial consultant) testified that the design and construction of the conveyor, including the hooks on the mandrel carts, cam releases and pusher dogs was unprofessional and inadequate. He also

---

[4]"Riding the cart" simply means that the worker stood on the shoulder or shelf on the cart and applied pressure to the cart hook in order to keep it engaged in the conveyor chain. It was often necessary for the operator to place his weight on the hook because the hooks had become bent and out of alignment, and by keeping pressure on the hook, the cart would continue moving on the conveyor system. There was no control switch at or near the oven door to stop the conveyor system. The manual switch was located several feet from the system. Plaintiff could not remember the details of the accident as the mandrel cart approached oven No. 4.

indicated that the type of air cam used was not consistent with good engineering as there was no safety latch to prevent failures.

The trial judge gave the following reasons for granting Beattie and Minder a new trial: The oven and door were designed and manufactured by Beattie from plans; its plans and specifications made no reference to a chain conveyor being operated to or through the oven; a Beattie employee became aware of the conveyor system after installation had actually occurred when he was starting the ovens and checking out limit switches which activated the oven door; the evidence established that plaintiff's injuries were suffered as a result of a malfunction of the delatching systems which delatched the mandrel carts from the conveyor before the carts reached the oven door; the specific device which malfunctioned was not established by sufficient, substantial evidence to support the verdict against Minder and Beattie under the doctrines of products liability or breach of warranty; there was not sufficient evidence to warrant the jury's finding that the oven door manufactured by Beattie or the conveyor system manufactured by Minder contained a defect which existed when the products left the control of those firms; on the other hand, there was substantial evidence that the products designed and manufactured by Beattie and Minder were altered and changed by UTC through Diffenbaugh; specifically, the cams designed and installed by Minder were removed and replaced by air-actuated cams; a fail-safe device was installed on the oven door; the fail-safe device was a delatching device intended to disconnect the mandrel cart from the conveyor chain before the cart entered the oven; the air activated cam was intended to activate the oven door and both cams were installed by persons other than Minder; changes were also made in the cart hooks designed and manufactured by Minder; Diffenbaugh, through its employees, undertook certain modifications in respect to both the conveyor system and oven door; in each instance, Diffenbaugh's work was inspected and approved by UTC, plaintiff's employer; consequently, the judgment as to Diffenbaugh could not be sustained under the doctrine of products liability but only under the theory of negligence; there was no substantial evidence of breach of warranty by Diffenbaugh; nevertheless Diffenbaugh did install the air activated cam intended to delatch the mandrel cart immediately before the same reached the oven door; this cam malfunctioned and the fail-safe device, a second delatching device, did not function to delatch the cart in time to avoid plaintiff's injuries; the verdict cannot be sustained under the theories of products liability or breach of warranty as to any of the defendants; there

is only sufficient evidence to sustain the verdict under the theory of negligence as to defendant Diffenbaugh.

## ISSUES

Diffenbaugh raises the following issues: (1) the evidence is insufficient to sustain the verdict inasmuch as (a) it was not negligent in that it owed no duty to UTC employees, (b) the conduct of its millwrights and iron workers was not a proximate cause of plaintiff's injuries, and (c) there was no substantial evidence to support the verdict on the warranty and strict liability theories; (2) the jury instructions were erroneous and confusing; and (3) the verdicts were ambiguous because the evidence established that UTC was guilty of negligence as a matter of law in that it violated a safety order that required guard rails around the conveyor system.

Valdez and UTC's compensation carrier maintain in their cross-appeals that the order granting Minder and Beattie a new trial was wrong inasmuch as there was substantial evidence to support the verdict on warranty and strict liability theories.

In their cross-appeals, Beattie and Minder merely maintain that there was insufficient evidence of liability under either the theories of strict liability in tort or warranty to sustain the judgment.

## DIFFENBAUGH'S APPEAL

■ Actionable negligence consists of three elements: (1) a defendant's legal duty to use due care; (2) a breach of that duty; and (3) the breach as the proximate (or legal) cause of plaintiff's resulting injury. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.,* 1 Cal.3d 586, 594 [83 Cal.Rptr. 418, 463 P.2d 770]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 488, p. 2749.) ■ Diffenbaugh contends that the trial court record lacks substantial evidence in regard to two of the three aforementioned elements. In particular, the general contractor maintains that it (1) owed no legal duty of due care to this plaintiff, and (2) even if such a duty did exist, no act committed by Diffenbaugh or any of its employees proximately resulted in Valdez' injury. After careful review of the record we must conclude that Diffenbaugh's arguments are without merit.

Diffenbaugh contends that it was assigned specific, limited tasks at the UTC plant and that, in the performance of these tasks, the scope of its legal duty to exercise due care never extended to UTC production-line workers. Specifically, defendant maintains that, as an independent contractor, establishment of its duty of due care turns upon the test set forth in *Biakanja* v. *Irving,* 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], and that this test, when applied to the facts of the instant case, mandates the conclusion that Diffenbaugh owed plaintiff no duty of due care whatsoever.

An indispensible prerequisite to the imposition of liability based upon negligence is the existence of a duty of due care owed by the defendant to the person injured, or to a class of persons of which the plaintiff is a member. (*Richards* v. *Stanley,* 43 Cal.2d 60, 63 [271 P.2d 23].) Duty, however, is a rather ephemeral concept: It may be imposed by statute or the terms of a contract; it may arise from the character of particular activities or from the nature of human society itself—and its ascertainment and definition in any specific factual context is an imprecise task at best.

In attempting to formulate general guidelines for the ascertainment of the duty of due care, courts have advanced a variety of definitions: For example—"The risk reasonably to be perceived defines the duty to be obeyed." (*Palsgraf* v. *Long Island R. Co.,* 248 N.Y. 339, 344 [162 N.E. 99, 59 A.L.R. 1253].) "The duty arises . . . only where a reasonable man would recognize the existence of an unreasonable risk of harm to others through the intervention of [defendant's] . . . negligence." (*Schwartz* v. *Helms Bakery Limited,* 67 Cal.2d 232, 237, fn. 3 [60 Cal.Rptr. 510, 430 P.2d 68], quoting from Prosser, Law of Torts (3d ed. 1964) § 33, pp. 175-176.) But formulations such as these are so vaguely phrased that they are of little assistance in a particular factual context.

Our state Supreme Court has often commented upon the problems inherent in attempting to formulate a shorthand definition of "duty" in a negligence context. The court has concluded that, "The assertion that liability nevertheless must be denied because defendant bears no 'duty' to plaintiff 'begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . It [duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those

considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (*Dillon* v. *Legg,* 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], quoting from Prosser, Law of Torts (3d ed. 1964) pp. 332-333.)

For years the courts of this state, in recognition of the aforementioned characterization of duty, have applied a six-prong policy test in negligence actions. Originally applied in a case where contract terms framed the duty owed (*Biakanja* v. *Irving, supra,* 49 Cal.2d 647, 650; *Stewart* v. *Cox,* 55 Cal.2d 857, 863 [13 Cal.Rptr. 521, 362 P.2d 345]), it has been unhesitatingly applied (in slightly rephrased form) to personal injury actions unrelated to any breach of contract. (See *Rowland* v. *Christian,* 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) ■ The six policy factors which must be balanced in determining the scope of a particular defendant's duty of due care include: (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that plaintiff suffered injury; (3) the closeness of connection between the defendant's act and the plaintiff's injury; (4) the moral blame attached to defendant's conduct; (5) the policy of preventing future harm; and (6) the extent of defendant's burden and the consequences to the community of imposing a duty and liability. (*Connor* v. *Great Western Sav. & Loan Assn.,* 69 Cal.2d 850, 865 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224].)[5]

Diffenbaugh's millwrights and iron workers completed the following tasks (among others) at UTC's Riverside facility: They repaired and reworked mandrel carts and replaced many, if not all, of the cart hooks; installed an air-actuated cam (delatching device) a few feet in front of the door to oven No. 4; worked on the installation of, and repaired, the plant's conveyor system; installed a fail-safe device (an incline plane) on the entry to oven No. 4, as well as on the other oven doors; removed a door from another oven and rehung this door on the No. 4 oven; and adjusted the limit switch at oven No. 4.

■ It is apparent from the trial court record that Diffenbaugh employees negligently performed several of their tasks, and that it was the confluence of these several errors which resulted in plaintiff's injury. However, for purposes of resolving the duty issue aforementioned we need only analyze one of the tasks improperly performed by Diffenbaugh's employees.

---

[5]A seventh consideration—the availability of insurance—is sometimes weighed in the balance as well. (See *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 113.)

Valdez would not have been injured had the fail-safe device on oven door No. 4 functioned properly and delatched the mandrel cart from the conveyor chain (thereby halting it before it crushed plaintiff against the oven door). The fail-safe device malfunctioned because oven door No. 4 failed to close completely. That very same oven door had been reworked and installed by Diffenbaugh personnel. They also had affixed the fail-safe device to the same door. Defendant's employees erred when they hung oven door No. 4 in such a way that it repeatedly failed to close completely.

Evaluating these facts in light of the aforestated six-prong policy test yields the following analysis: (1) If defendant's employees hung oven door No. 4 so that it occasionally failed to close tightly, it was reasonably foreseeable that a fully loaded mandrel cart would crash into oven door No. 4, since the incline-plane fail-safe device would not function when the door was not completely closed; UTC employees worked in close proximity to the conveyor chain, the mandrel, and the oven door; it was equally foreseeable that a UTC worker would enter the area between the mandrel and the oven door (i.e., in order to retrieve a tool or inadvertently) simultaneous with the fail-safe's malfunction, and be injured. (2) Plaintiff was severely and permanently injured. (3) But for the failure of Diffenbaugh's workmen to hang the entry door at oven No. 4 correctly, plaintiff would not have been injured inasmuch as the mandrel would have come to a halt some 18 inches in front of the door; no closer connection between defendant's negligent act and the ensuing injury could be demonstrated. (For further discussion, see actual and proximate cause analysis which follows, *infra.*) (4) Diffenbaugh's negligence in improperly hanging the oven door—knowing that the safety of industrial workers depended upon proper installation—constituted a sufficient disregard for human life so that this behavior may be characterized as morally wrong. (5) Finding a duty herein will provide industrial repairers with an incentive to insure that, in the future, they will give due consideration to the personal safety of workers other than their own when they install potentially dangerous industrial equipment (and attendant safety devices). And (6) Diffenbaugh rightly should bear all or some part of the financial burden flowing from the injury: Its employees installed and reworked the defective door; it possessed engineering expertise in industrial design and plant construction far superior to the UTC engineers assigned to the job; it was the only party with sufficient exposure to, and contact with, the oven door to make sensible repair recommendations; and the only informed party sufficiently equipped to make any needed repairs.

Resolution of each of the foregoing policy considerations indicates that Diffenbaugh had a duty of due care in its construction and repair activities at the Riverside plant vis-a-vis this injured plaintiff. On the other hand, Diffenbaugh suggests no credible policy reasons to reach a contrary conclusion. Consequently, we have concluded Diffenbaugh owed Valdez a duty of due care in the circumstances of this case.

Next Diffenbaugh contends that the record lacks substantial evidence regarding an act of negligence committed by Diffenbaugh which proximately caused plaintiff's injury. This argument takes two forms: (1) The record lacks evidence of *what*, precisely, caused the injury, or that Diffenbaugh was responsible for the causative act; and (2) that the negligent acts of UTC (plaintiff's employer) intervened to relieve Diffenbaugh of liability. Again we disagree.

The concurrence of several negligent acts caused Valdez' injury; *but for* the occurrence of each of these acts the plaintiff would not have been injured.

■ All a plaintiff need show to establish proximate, or legal, cause is that the defendant's negligent act in some way contributed to the injury (e.g., *but for* defendant's negligence the injury would not have occurred). (*Akins* v. *County of Sonoma,* 67 Cal.2d 185, 199 [60 Cal.Rptr. 499, 430 P.2d 57]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 622, pp. 2903-2905.) Thus, Valdez only had to demonstrate that *but for* a single negligent act by Diffenbaugh, he would have escaped injury. We have concluded that the record contains substantial evidence of causation.

In a philosophical sense, cause and effect find their beginning and end in the boundless and unascertainable. Consequently, courts, in their finitude, do not attempt to approach cause and effect in any absolute degree, but only in such a manner as is practicable. Therefore, such qualifying words as "proximate," "legal," and "natural" have come into use as establishing the boundaries beyond which the courts will not traverse in the attempt to trace the connection between a given cause and a given effect. A plaintiff alleges, as an effect, some injury that has been done to his person or property. He shows that prior to the injury a wrongful act of another person occurred, and that but for the occurrence of this wrongful act, the injury complained of would not have been sustained. We then say that the wrong was a cause of the injury. "But to make such a standard (that, if the cause had not existed, the effect would not have occurred) the basis of legal responsibility would soon prove

very unsatisfactory; for a reduction ad absurdum may be promptly established by calling to mind, that, if the injured person had never been born, the injury would not have happened. So the courts ask another question: Was the wrongful act the proximate cause?" (*Atlantic Coast Line R. Co.* v. *Daniels,* 8 Ga.App. 775, 777 [70 S.E. 203, 205].)

Defendant's negligent act must be the proximate, or legal, cause of the plaintiff's injury in order for the defendant to be held liable. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 620, p. 2901.) ■ Proximate cause is not a question of causation; it is simply a policy determination of whether or not the defendant should be held responsible for his acts. (Prosser, Law of Torts (4th ed. 1971) p. 244.) Inasmuch as we have previously determined that Diffenbaugh owed a duty of due care to Valdez and that his injury and the manner in which it occurred was foreseeable, the conclusion that Diffenbaugh was the proximate cause of Valdez' injury is inescapable.

"The plaintiff is not required to establish the fact of causation with absolute certainty. It is sufficient if there is evidence from which reasonable men could conclude that it is more probable that the defendant's conduct was a cause, than that it was not." (*Ahrentzen* v. *Westburg,* 263 Cal.App.2d 749, 751 [69 Cal.Rptr. 916]; see also *Barham* v. *Widing,* 210 Cal. 206, 215 [291 P. 173]; *Love* v. *Wolf,* 249 Cal.App.2d 822, 838 [58 Cal.Rptr. 42]; *Barclay Kitchen, Inc.* v. *California Bank,* 208 Cal.App.2d 347, 354 [25 Cal.Rptr. 383].) ■ A plaintiff may show that it is reasonably probable to infer that defendant's negligent act proximately caused his injury by circumstantial and indirect evidence; he need not show that there is no possibility of deriving any other reasonable inference from the evidence. (*Kopfinger* v. *Grand Central Pub. Market,* 60 Cal.2d 852, 856-857 [37 Cal.Rptr. 65, 389 P.2d 529]; *Varas* v. *Barco Mfg. Co.,* 205 Cal.App.2d 246, 262 [22 Cal.Rptr. 737]; *County of Alameda* v. *Tieslau,* 44 Cal.App. 332, 337-338 [186 P. 398].)

■ Diffenbaugh attached fail-safe delatching devices (triangularly shaped incline-planes) to all oven entry doors at the Riverside plant. The fail-safes were designed to prevent the mandrel carts from crashing into the oven doors. The fail-safe sat astride the conveyor chain when the oven door was closed and dislodged the cart hooks from the chain. If the oven door did not close completely, the fail-safe would not work. Because of problems experienced with the original door, Diffenbaugh reworked and rehung the entry door at oven No. 4. Diffenbaugh was aware that the door had to close fully each time or the fail-safe would

abort. Diffenbaugh workers negligently hung the oven door, and on the day of the accident, the door failed to close completely; the fail-safe device did not engage; and the mandrel cart crashed into the oven door. *But for* the failure of the oven door to close tightly, the fail-safe device would have halted the cart and plaintiff would have avoided the injury. Hence, it appears reasonably probable from the evidence presented at trial, and the inferences drawn therefrom, that Diffenbaugh's negligence in hanging oven door No. 4 was a proximate cause of plaintiff's injury.

■ Diffenbaugh's contention that the negligence of UTC, plaintiff's employer, was an intervening cause which relieved Diffenbaugh of liability is without merit. Diffenbaugh argues that UTC was negligent for two reasons: (1) It failed to provide guard rails around the door to oven No. 4 (as required by state safety regulations) and (2) it inspected and approved all tasks performed by Diffenbaugh. The arguments are unpersuasive.

Although UTC approved Diffenbaugh's work, its engineers did not possess the requisite skills to design and construct the Riverside facility. UTC *relied extensively* on Diffenbaugh personnel for construction and design expertise in putting the plant together. In light of this, UTC's approval of Diffenbaugh's work cannot possibly, in any way, constitute an intervening act of negligence relieving Diffenbaugh of responsibility.

■ Violation of a statute or safety regulation does not expose one to liability for negligence unless the violation *proximately causes* the injury in question. (*Haft* v. *Lone Palm Hotel,* 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465].) And a negligent act totally unrelated causatively to the accident at issue cannot be adjudged an intervening cause. (Cf. *Asplund* v. *Driskell,* 225 Cal.App.2d 705, 715-716 [37 Cal.Rptr. 652].)

UTC's failure to erect guard barriers in violation of state safety requirements was totally unrelated to the occurrence of the accident. The original mandrel cart hooks were defective; they bent and would not stay attached to the conveyor chain "dogs;" Diffenbaugh replaced these hooks with new ones—the replacement was negligently done inasmuch as the new hooks continued to bend and break loose from the "dogs"; therefore, UTC production workers had to stand on top of the cart hooks in order to keep them attached to the conveyor chain as the mandrels progressed through the plant; Valdez was standing on top of the cart hook just before the accident; he was positioned between the cart and oven door because the hooks installed by Diffenbaugh were inadequate

for the use to which they were put; on the other hand, he was not situated in the danger zone because of any lack of barrier rails. Thus, UTC's negligence had nothing to do with the accident. It in no way *caused* the injury and the jury was right in finding that UTC's negligence was *not* the proximate cause of the accident and injury.

Diffenbaugh also contends that erroneous jury instructions and a "hopelessly ambiguous" verdict require reversal. We again disagree.

Diffenbaugh argues the trial court erred in giving confusing instructions regarding the word "plaintiff" and that use of this word in reference to several different parties prejudiced defendant's case.[6]

In determining whether or not particular instructions are in error, or prejudicially ambiguous, the objected to instructions must be construed together with all other instructions. (*Woodcock* v. *Fontana Scaffolding & Equip. Co.*, 69 Cal.2d 452, 458 [72 Cal.Rptr. 217, 445 P.2d 881]; *Bakity* v. *County of Riverside*, 12 Cal.App.3d 24, 34 [90 Cal.Rptr. 541].) When the instructions, considered as a whole, state the law fairly and clearly, they are unobjectionable even though, by selecting isolated passages from single instructions, they may in some respects be subject to criticism. (*Waller* v. *Southern Pacific Co.*, 66 Cal.2d 201, 213 [57 Cal.Rptr. 353, 424 P.2d 937]; see also *Sebrell* v. *Los Angeles Ry. Corp.*, 31 Cal.2d 813, 817 [192 P.2d 898].)

After carefully reviewing all the instructions, we are satisfied that they correctly stated the applicable law and were not ambiguous. In particular, Diffenbaugh's objection to the use of the term "plaintiff" to denominate several parties to the lawsuit is groundless inasmuch as the court made some effort to specifically designate each of the parties-plaintiff. (Valdez and UTC's insurance carrier.) In short, no error may be found in the trial court's instruction to the jury.

Finally, Diffenbaugh contends that the jury verdict was hopelessly ambiguous, requiring a reversal. (*Woodcock* v. *Fontana Scaffolding & Equip. Co., supra,* 69 Cal.2d 452, 457.) But the alleged ambiguity in the

---

[6]Diffenbaugh also contends that errors were committed in instructing the jury on products liability. Since we have found it unnecessary to address this issue on appeal, there exists no need to discuss these instructions in this opinion.

Defendant also argues that error was committed in instructing the jury on the issue of the absence of a barrier rail at oven No. 4. But as previously indicated, the absence of this rail was of no import whatsoever in adjudicating Diffenbaugh's liability, and if the court erred in its instructions thereupon, no prejudice whatsoever could have been suffered by the defendant.

verdicts (insofar as the negligence action is concerned) has to do with the failure of UTC to erect barrier guards at oven No. 4. This argument has force if and only if UTC's negligence was somehow causatively related to the accident. As noted previously, the issue of the barrier rails was of no moment whatsoever and, hence, once this consideration is set aside no ambiguity even arguably appears.

### CROSS-APPEAL: ORDER GRANTING NEW TRIAL

Valdez and UTC's compensation carrier have both cross-appealed from the trial court's order granting a new trial to Beattie and Minder. After reviewing the record we must conclude that the trial judge did not abuse his discretion in entering the new trial order.

In ruling on a motion for new trial, the trial court reweighs the evidence, and should grant a new trial if the jury's verdict appears to be against the weight of the evidence; the judge may review conflicting evidence, weigh its sufficiency, consider credibility of witnesses and draw reasonable inferences from the evidence presented at trial. (*Perry* v. *Fowler,* 102 Cal.App.2d 808, 811 [229 P.2d 46]; 5 Witkin, Cal. Procedure (2d ed. 1971) §§ 34-35, pp. 3610-3611.) On review an order granting a new trial may be reversed only if there exists no substantial basis in the record to support the order. (Code Civ. Proc., § 657.) The presumptions on appeal are in favor of the order, and review is limited to determining whether there exists *any* support in the record for the order; the order will be reversed only upon a strong affirmative showing of an abuse of discretion. (See *Bardessono* v. *Michels,* 3 Cal.3d 780, 795 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Brandelius* v. *City & County of S. F.,* 47 Cal.2d 729, 733 [306 P.2d 432].)

Bearing the aforesaid rules in mind, we turn our attention to the court's specification of reasons for granting a new trial. The court noted that the actions against Minder and Beattie were based upon products liability and breach of warranty theories; that while one cause of the accident was the failure of oven door No. 4 to close completely, thereby preventing the door's fail-safe device from stopping the mandrel, there was not sufficient evidence presented at trial to permit the jury to conclude that this failure was due to a defect which existed when the door left the oven manufacturer's (Beattie's) control. Similarly, the court stated that another cause of the accident was the failure of the air-actuated cam manufactured by Minder to delatch the cart which struck Valdez; however, the record was lacking in evidence to support the inference that a manufacturing defect caused the cam malfunction.

A review of the record supports the trial court's conclusions. While there is no doubt that both the cam and door failed to operate properly, there exists no substantial evidence that these failures could be attributed to manufacturing defects which existed when the products left the control of the two suppliers.

### CROSS-APPEALS: ORDER DENYING MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

██ Beattie (the oven manufacturer) and Minder (the conveyor and mandrel cart manufacturer) both suggest that the trial judge erred in denying their motions for judgment notwithstanding the verdict. We disagree.

The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict: it cannot weigh the evidence. (*Spillman* v. *City etc. of San Francisco,* 252 Cal.App.2d 782, 786 [60 Cal.Rptr. 809].) A directed verdict may be entered only when there is no substantial conflict in the evidence: the trial court must indulge in every inference in favor of the party against whom the motion is directed. (4 Witkin, Cal. Procedure (2d ed. 1971) § 353, pp. 3152-3153.) Unless it may be said that no other reasonable conclusion is deducible from the evidence except that the moving party must prevail, the motion for directed verdict (or judgment notwithstanding the verdict) must be denied. (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768].)

Beattie manufactured the ovens and oven doors for the Riverside plant. From the outset of its operations, UTC found the doors unsatisfactory, and eventually had many of them reworked and rehung. Although the original order placed with Beattie for construction of such ovens did not indicate whether or not a conveyor system would be utilized for transporting the mandrels into the ovens, a Beattie employee became aware of the system (albeit after installation had occurred) when he lit the ovens so that manufacturing operations could commence. Through the employee's observations and by reason of subsequent work orders received from UTC, Beattie either knew or should have known that there was a conveyor system in use and that the oven doors were being damaged in collisions with the mandrels and carts. One of the causes of Valdez' injury was the failure of oven door No. 4 to close completely.

Minder manufactured the conveyor system, mandrel carts and cart hooks. Serious flaws in the conveyor system were discovered shortly after production began. Minder either knew or should have known of the defects inasmuch as discussions aimed at rectifying the defects were held between Minder's employees and UTC's employees several months prior to the accident in question. The air-actuated delatching cam which failed to operate on the day of Valdez' injury was also manufactured by Minder. The failure of the cam and the inadequacy of the cart hooks, in part, caused the injury.

From the foregoing facts, the conclusion that both Beattie and Minder may have manufactured defective products which resulted in Valdez' injury is unavoidable. Consequently, the trial judge properly denied the motions for judgment n.o.v.

### DISPOSITION

The judgment and orders are affirmed.

Gardner, P. J., and Kaufman, J., concurred.