## BANGOR & AROOSTOOK R. CO. v. JONES.

Circuit Court of Appeals, First Circuit. December 23, 1929.

No. 2387.

George E. Thompson, Henry J. Hart, and Frank P. Ayer, all of Bangor, Me., for appellant.

Frank Fellows (of Fellows & Fellows), of Bangor, Me., and Frederick R. Dyer, of Portland, Me., for appellee.

Before BINGHAM, Circuit Judge, and MORRIS and LOWELL, District Judges.

BINGHAM, Circuit Judge. This is an action of tort brought under the Federal Employers' Liability Act (45 USCA §§ 51–59) against the Bangor & Aroostook Railroad

Company to recover damages for the death of Byron McLaughlin, who was instantly killed on May 23, 1926, while in the defendant's employment as a light repairman repairing freight cars for it on the repair tracks of the Maine Central Railroad, at a place known as Northern Maine Junction, in the town of Hermon, Me. He left a widow, Vira J. McLaughlin, for whose sole benefit the action is brought. Since his death Mrs. McLaughlin has again married. She brings this action as the administratrix of McLaughlin's estate. It is conceded the work, in which McLaughlin was engaged at the time he met his death, was in repairing cars used in interstate commerce, which was undoubtedly the fact. The ground upon which the plaintiff seeks to recover is that the defendant, through its officers, agents, and employees, knowing that the plaintiff's intestate was at work upon repair track No. 2, without warning, though it was customary to give warning, negligently drove other cars in and upon track No. 2, causing him to be crushed and instantly killed between two cars, between the ends of which a gap or space had been left for his protection, when the cars were put there to be examined and repaired.

The defendant pleaded the general issue, and under a brief statement set up as special matter of defense: (1) That the plaintiff's intestate assumed the risk; (2) was guilty of contributory negligence; and (3) that he was insured, without charge or cost to himself, in the sum of $2,000 on his life, for the benefit of his heirs, by and at the instance of the defendant, which sum had been paid to the plaintiff.

The accident occurred on the 23d day of May, 1926. The writ is dated May 16, 1928, and was returnable at the term of court held at Bangor within and for the District of Maine on the first Tuesday of the ensuing June. At the time the suit was brought the plaintiff was a resident and citizen of Dorchester, Mass., where she had lived since her remarriage in June, 1927. The case was set for trial on the 21st day of November, 1928, at which time the defendant filed the following motion:

"And now comes the said defendant, the Bangor & Aroostook Railroad Company, and says that an action between the same parties for the same cause was brought by the same plaintiff against the same defendant in the Supreme Judicial Court, within and for the County of Penobscot, and State of Maine, at the April term of said court, A. D. 1927; that said case, in said Supreme Judicial Court, * * * was heard before a jury,

and at said April term * * * damages were assessed against the said defendant in the sum of forty-seven hundred and fifty ($4750.00) dollars; that said defendant company took an appeal from said decision of said court to the Law Court of the State of Maine; that said case was argued before said Law Court * * * at the December term, 1927; that after full hearing upon said motion, the Law Court allowed the motion of said defendant company and ordered a new trial; * * * that afterwards, to wit, during the April term of Supreme Judicial Court, A. D. 1928, said plaintiff became nonsuited in said Supreme Judicial Court; that at said term of court an execution was issued in favor of [against] said administratrix in the sum of five hundred sixty-four dollars and ninety-three cents ($564.93), costs of suit, together with fifteen ($.15) cents more for execution; that said execution, hereinbefore described, has never been settled or paid by said Vira J. McLaughlin, administratrix, and remains wholly unsatisfied.

"Wherefore your defendant prays that said plaintiff in this action be not allowed to proceed in this suit, which is brought for the same cause, before the costs of the hereinmentioned suit are paid, and your defendant further prays that further proceedings in this court shall be stayed until such costs are paid."

In support of this motion the defendant called to the court's attention section 146, c. 87, of the Rev. Statutes of Maine, and section 914 of the Rev. Statutes of the United States (28 USCA § 724), but offered no proof in support of its motion.

Section 146, c. 87, of the Rev. Statutes of Maine reads as follows:

"When a plaintiff becomes nonsuit, or discontinues his suit, the defendant recovers costs against him, and in all actions, as well those of qui tam as others, the party prevailing is entitled to his legal costs. When costs have been allowed against a plaintiff on nonsuit or discontinuance, and a second suit is brought for the same cause before the costs of the former suit are paid, further proceedings shall be stayed until such costs are paid, and the suit may be dismissed unless they are paid at such time as the court appoints."

Section 914 of the Rev. Statutes of the United States (28 USCA § 724) reads:

"The practice, pleadings, and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the Circuit and District Courts, shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceeding existing

at the time in like causes in the courts of record of the State within which such Circuit or District Courts are held, any rule of court to the contrary notwithstanding."

Although no evidence was offered to substantiate the facts alleged in the motion, the District Court apparently was of the opinion that, if the facts alleged in the motion were true, they did not state a case within the meaning of the state statute, even though that statute might be enforced as a rule of practice in the Federal District of Maine, by reason of the Conformity Act (R. S. § 914 [28 USCA § 724]), on a state of facts falling within the meaning of the Maine act; and denied the motion, subject to the defendant's exception.

The foregoing motion having been denied the defendant filed the following motion:

"And now comes the defendant in the above-entitled case and prays this Honorable Court to cause an order to be entered for security for costs and to impose such further terms and [in] reference thereto as may be deemed by the court right and proper."

In support of this motion the defendant called attention to Rule 6 of the District Court of Maine, reading as follows:

"Except as otherwise directed by law, whenever all the plaintiffs in proceedings at common law or in equity reside without the district, any defendant may, within one calendar month after his appearance, enter an order as of course for security for costs to be furnished within one calendar month after notice thereof by the clerk, in not over two hundred dollars, by a surety to be approved by the clerk, or by a deposit in the registry; but the court, or a judge thereof, may direct new or additional security, or strike out or modify such order. On failure to give such security the proceedings shall be dismissed, unless the court or judge impose further terms in reference thereto.

"In cases not provided for by this rule or by the rules promulgated by the Supreme Court, the security to be given shall be ordered in the particular case."

The defendant contended that, inasmuch as it had not caused an order to be entered for security for costs within a calendar month after its appearance was made, the applicable provision of Rule 6, to the situation as presented, was to be found in the last paragraph of the rule.

The plaintiff contended that the motion should be denied, because of the defendant's delay in presenting its motion to the morning of the starting of the trial; and that in any event she could come in under the pauper rule and proceed without paying costs. The court in the exercise of its discretion denied the motion without prejudice to its renewal if, during the progress of the trial, it appeared that the plaintiff had ability to pay, or anything of that sort, when the defendant might renew its motion. The defendant at no time renewed its motion. It excepted to the ruling.

The jury returned a verdict for the plaintiff upon which judgment was entered, and the defendant appealed.

In the assignments of error, upon which it relies, the defendant complains that the court erred: (1) In denying its first motion; (2) in denying its second motion; (3) in denying its motion for a directed verdict at the close of all the evidence; (4) in refusing to instruct the jury as per requests Nos. 1 to 15, inclusive; (5) in refusing to instruct the jury that there was no evidence in the case that at the time of the accident McLaughlin was at work upon any car; and (6) that the court erred in its charge to the jury relating to insurance.

■ The denial of the defendant's first motion for the payment of costs in the suit in the state court was not error: First, because the defendant did not support the allegations of its motion by showing that they were true. And, second, because if the facts alleged were true, they did not answer the requirements of section 146, c. 87, of the Rev. Statutes of Maine. That act contemplates that, when costs have been allowed in the state court against a plaintiff, who has become nonsuit or discontinued a suit there brought, he can be precluded from maintaining a second suit for the same cause in the courts of the state, unless he pays the costs in the prior suit. If the Conformity Act (28 USCA § 724) makes this provision of law a rule of practice in the Federal District Court of Maine, it does so only where a plaintiff has become nonsuit or discontinued a cause, originally brought in the District Court of Maine, who subsequently brings a second suit for the same cause against the same defendant, in the Federal District Court of Maine. In such case it would seem that, under the Conformity Act, the Maine statute would be applicable; but we do not think that it is here, for the facts stated in the motion are that the prior suit, in which the costs were allowed, was brought in the state court. This disposes of the first assignment of error.

■ The denial of the second motion was likewise proper. It was discretionary with the court to say whether it would grant or refuse it. The motion was presented late.

It did not appear that the plaintiff had the funds to meet the requested security, and the defendant was adequately protected by being accorded the privilege of renewing its motion at any time upon its being made to appear that the plaintiff had funds or means to meet the security. The defendant did not renew its motion. It takes nothing by this assignment of error.

The principal question in the case relates to the defendant's motion for a directed verdict on the grounds: (1) That there was no evidence that the defendant was negligent; (2) that there was no evidence that the plaintiff's intestate was injured while rendering service in the course of his employment; (3) that as a matter of law the plaintiff's intestate assumed the risk, for the danger was an obvious one, and for the reason that from the evidence no other conclusion could be drawn than that he assumed it.

Construing the evidence most favorably for the plaintiff, which we are required to do, it tends to prove that on the 23d day of May, 1926, the plaintiff's intestate was employed by the defendant as a light repairman, whose duty it was to make light repairs on freight cars, and that the place at which he was required to perform his work was on two tracks, known as track No. 1 and track No. 2, in the freight yard at Northern Maine Junction; that he had worked for the defendant for a number of years, and for about one year had been engaged as a light repairman; that ordinarily two inspectors were employed there to examine and chalk mark the cars where they thought they needed repairs, and three light repairmen to make the repairs, but on the forenoon of the day of the accident there were, beside the two inspectors, only two repairmen at work; that the duties of a light repairman consisted in putting on column nuts, brake shoes, screws in running boards, tightening up lug straps, which are iron supports extending under and across the drawbars or couplers of cars, in repairing handholds and ladders on the sides and ends of cars, and putting nuts on the cylinder situated underneath and in the center of a car; that in the performance of this work the plaintiff's intestate was required to go upon the top of the cars, and to enter upon the track under and between the ends of cars; that it was the duty of a repairman to make repairs, not only at the places designated by the chalk marks put upon the cars by the inspectors, but to make such repairs as he himself saw were necessary; that the two tracks, where this work was done, were in the form of the letter Y, and extended easterly, from the point where the arms of the Y connected, a distance far enough to contain 60 or more cars, after allowing an adequate space for clearance immediately east of the junction of the arms of the Y; that the northerly or upper arm of the Y, extending easterly, constituted track No. 2, and the southerly arm, likewise extending, was track No. 1; that at the junction of the Y there was a switch and at some distance westerly from that point were some scales, where they weighed the cars, which were usually loaded, for it was at this yard that cars coming off the defendant's main line, after being weighed and repaired, were taken over by the Maine Central Railroad; that from the scales the track continued westerly and then turned and extended northerly to a point known as the Tower, situated three-quarters of a mile or so from the scales; that in the vicinity of the Tower the defendant had a freight yard, connecting with its main line; that in this freight yard, what is spoken of in the evidence as cuts of cars, each cut consisting of 20 or more cars, were made up; that each cut, as made up, was attached to a shifting engine, having a crew of five men, and pushed down the track from the Tower to the scales, where each car was weighed and, on completion of the weighing, the cars were pushed east and left either on track No. 2 or track No. 1, as desired; that in the early morning of the day of the accident 41 cars were placed on track No. 1, and pushed to the easterly end of that track, and then a second cut of 20 cars was pushed in on track No. 1 a sufficient distance so that the most westerly car was clear of cars passing over the Y onto track No. 2; that these cuts of cars filled track No. 1; that later, at 9:15, 9:50 and 10:20 a. m., three cuts of cars, consisting of 20 or more each, were placed on track No. 2, the first cut being moved toward the east on that track, the second cut being moved easterly a sufficient distance to leave a space or gap of a foot and a half or so between the west end of the first cut and the east end of the second cut, the brakes on the cars of the first and second cuts being set to hold them stationary; that at about 7 o'clock on the morning of the accident, the plaintiff's intestate, preceded by one of the inspectors, went to work making repairs with Ellis, the other repairman; that at 8 o'clock, or probably considerably later, the repairs on the 41 cars on track No. 1 were completed; that for some time that forenoon McLaughlin worked on the north side of the first cut on track No. 2, while Ellis, the other repairman, for a brief space of time, if at all, worked on the south side

of that cut; that at some time prior to the accident, Ellis went to work on the second cut on track No. 1, working easterly, and was there working at the time of the accident; that during the forenoon and prior to the accident, the 41 cars on track No. 1 were moved easterly by the Maine Central Railroad to its main line; that shortly before the accident McLaughlin came to Ellis, who had three cars still to work upon on track No. 1, asked how he was getting along with his work, and then left; that Ellis did not see where McLaughlin went, as the three remaining cars he had to repair on track No. 1 prevented his doing so; that that was the first time he had seen McLaughlin for some time; that he did not know which side of track No. 2 McLaughlin came from, as he came down around the three cars that he (Ellis) was working east on; that shortly after McLaughlin left, Ellis heard the rattling of drawbars followed by a yell; that he went up on the south side of the three cars, around their end, and down on the other side, until he came to the place where he saw McLaughlin between the couplers; that he found McLaughlin in an upright position between the couplers, apparently having been thrown or twisted around, so that he faced west or southwest, by a blow of one of the couplers on the upper part of his body, the other coupler striking him lower down and tipping him back; that he had a string of nuts over his shoulder, but his tools, consisting of a crowbar, some wrenches, and a hammer, were on the ground between the rails; that at the time of the accident the train crew, in pushing the third cut of cars on to track No. 2, drove it against the second cut with such force as to take up the slack in those 20 or more cars and drive them, with their brakes set, a sufficient distance to close the gap or space between cuts one and two and kill McLaughlin; that the men in the train crew knew tracks 1 and 2 were repair tracks and that the repairmen were there at work that forenoon; that it was customary to leave gaps or spaces between cuts of cars set on those tracks, as a safety provision for the men repairing the cars; that it was a recognized rule that cars placed on those tracks were not to be moved until the repairmen gave notice they had finished their work; that before they had finished their work, and without notice to McLaughlin, the space or gap between cuts 1 and 2 was closed up by pushing down cut 2 and driving it against McLaughlin, without warning and before he could observe what was taking place.

We think the jury could reasonably find that McLaughlin, at the time he met his death, was acting within the scope of his employment; that the reasonable inferences from the evidence are that he did practically all, if not all, the repair work that was done on the first cut of cars on No. 2 track, and had finished it, with the exception of what remained to be done on the three cars at the end of this cut where he was killed; that at the time of the accident he had worked on that cut for about an hour, and probably less, for that cut (the first one) was not placed on No. 2 track until 9:15 a. m., and the accident occurred about 10:20 a. m., when the third cut of cars was shunted into the second one, closing up the gap or space where McLaughlin was, and killing him; that his death was due to the carelessness of the defendant and its servants in driving the second cut of cars against him, without warning or taking any precautions for his safety; and that the risk was not an obvious one, and that the evidence was such as to warrant the jury in finding that he did not assume the risk. The motion for a directed verdict was properly denied. The case was plainly one for the jury.

The first six of the defendant's fifteen requests, which are assigned as error, as well as the one covered by the fifth assignment, above set out, raise the same question as its motion for a directed verdict and need no further consideration. The seventh request was given in substance. The eighth, eleventh, twelfth, and thirteenth requests have to do with the question of damages, as affected by the remarriage of McLaughlin's widow. Upon this question the jury were, in substance, charged that the plaintiff could recover only such pecuniary loss as she suffered by reason of being deprived of the reasonably expected pecuniary benefits that would have resulted to her by the continued life of her husband; and that they might take into consideration the fact that she had remarried and say how much, if anything, that reduced the damages, in view of all the evidence in the case. We think that this instruction was all the defendant was entitled to on this question.

The ninth, tenth, fourteenth, and fifteenth requests have to do with the question of damages not only as affected by the widow's remarriage, but by her receipt of the $2,000 of insurance. In these requests the defendant asked that the jury be directed to deduct the $2,000 of insurance from any damages that the plaintiff might be found to be entitled to recover. In support of its

contention the defendant called attention to section 5 of the Employers' Liability Act (45 USCA § 55), which provides:

"Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: Provided, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought."

There is no evidence in the case that the defendant contributed money toward the procurement of the insurance. If it had contributed money, it could have shown the fact and had the sum deducted, but it was not entitled to have the amount of the insurance deducted. See Phila., Balt. & Wash. R. R. v. Schubert, 224 U. S. 603, 612, 32 S. Ct. 589, 56 L. Ed. 911; Chicago & Alton Ry. v. Wagner, 239 U. S. 452, 458, 36 S. Ct. 135, 60 L. Ed. 379, last paragraph. This disposes of these requests.

The judgment of the District Court is affirmed, with costs to the appellee.