Deborah FOGG,
Appellant/Cross–Appellee,

v.

The NATIONAL RAILROAD PASSENGER CORP.,
Appellee/Cross–Appellant.

Nos. 89–910, 89–1076.

District of Columbia Court of Appeals.

Argued Oct. 17, 1990.
Decided Jan. 28, 1991.

H. Vincent McKnight, Jr., Washington, D.C., for appellant and cross-appellee.

R. Harrison Pledger, Jr., with whom Cynthia Vancil Santoni, McLean, Va., was on the brief, for appellee and cross-appellant.

Before ROGERS, Chief Judge, and STEADMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Plaintiff-appellant Deborah Fogg brought suit against her employer, the National Railroad Passenger Corporation (Amtrak), cross-appellant here, under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 *et seq.* (1988). That statute makes a common carrier by railroad engaged in interstate commerce "liable in damages to any person suffering injury while ... employed by such carrier in such commerce ... for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51.[1] The complaint alleged, in outline, that plaintiff, then a customer relations specialist with Amtrak, underwent lower back surgery in 1985 after which she returned to work and suffered increasing pain as a result of her job responsibilities, and that her supervisors, although aware of her complaints of pain and difficulty in carrying out her duties, negligently failed to modify either her duties or her work schedule.

During the trial, Judge Webber granted Amtrak's motion to exclude proof of plaintiff's future loss of wages to the extent that she continued to receive 60% of her salary under a long-term disability plan furnished by Amtrak. That ruling gives rise to the sole issue raised on appeal by plaintiff.[2] The case proceeded to verdict and the jury returned an award of damages for plaintiff of $400,000, but found that her own negligence contributed to the aggravation of her condition by 40%.[3] The court therefore entered judgment for plaintiff in the amount of $240,000. On appeal Amtrak contests the trial judge's refusal both to grant its motion for judgment notwithstanding the verdict and to grant a remittitur. We affirm the judgment in all respects.

## I.

Amtrak's primary argument is that the judge should have granted judgment in its favor as a matter of law because the evidence failed to establish either that Amtrak breached a duty owed to Ms. Fogg or that any such breach caused her injuries. Amtrak's burden on this issue is heavy: a judgment notwithstanding the verdict is proper only when "no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party." *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986).

Amtrak first contends that in light of the judge's instructions and the verdict form submitted to the jury, it is clear that the jury returned a verdict for plaintiff solely on the theory that Amtrak had negligently refused to grant Ms. Fogg's request to work a shortened (three-day) workweek until she recuperated from her back condition. Amtrak argues that plaintiff has failed to cite—and could not cite—any authority for the principle that an employer may be liable under the FELA for refusing to approve a request for part-time work. We agree with Amtrak that had the case been submitted to the jury—over Amtrak's objection—solely on the issue whether it was required, under the circumstances, to grant a request for a shortened workweek, then a serious and troubling issue would arise concerning the scope of employer liability under the FELA. We conclude, however, that that issue is not presented because the judge's instructions, viewed as a whole and in the context of the testimony, permitted the jury to find negligence on broader grounds discussed in the following.

---

1. 45 U.S.C. § 56 provides that, for purposes of such actions, the jurisdiction of the courts of the United States "shall be concurrent with that of the courts of the several States."

2. Pursuant to Rule 28(i) of this court's rules, plaintiff has been deemed the appellant here and Amtrak the cross-appellant.

3. 45 U.S.C. § 53 provides that in an action under the FELA, upon a finding of contributory negligence, "the damages shall be diminished by the jury in proportion to the amount of negligence attributable to [the] employee."

A railroad has a duty to use reasonable care in furnishing its employees with a safe place to work. *Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 558, 107 S.Ct. 1410, 1411, 94 L.Ed.2d 563 (1987). Although the FELA does not expressly set forth that duty, it "obtained at common law in employer-employee relationships generally and it is from this source, by judicial decision[,] that the doctrine has become an integral part of the FELA." *Isgett v. Seaboard Coast Line R.R.,* 332 F.Supp. 1127, 1139 (D.S.C.1971). *Atchison, Topeka & Santa Fe Ry. v. Buell, supra.*

> A railroad has a duty to assign employees to work for which they are reasonably suited. A railroad breaches that duty if it negligently assigns an employee to perform work beyond his capacity.

*Fletcher v. Union Pac. R.R.,* 621 F.2d 902, 909 (8th Cir.1980), *cert. denied,* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981). "The railroad is negligent if it knew or should have known that its assignment exposed the employee to an unreasonable risk of harm." *Id.* Moreover, in view of the remedial purpose of the statute, "[t]his continuous duty to provide a safe place to work is broader than the general duty to use reasonable care." *Ragsdell v. Southern Pac. Transp. Co.,* 688 F.2d 1281, 1283 (9th Cir.1982).

In the present case the trial judge instructed the jury that it was the continuing duty of the employer-defendant "to use ordinary care under the circumstances with respect to the health and safety of its employees." The instruction continued:

> A railroad company breaches that duty if it negligently requires its employee to perform work beyond her physical capacity, that is if the Defendant knew or should have known of the Plaintiff's diminished work capacity and in spite of that knowledge Defendant unreasonably

continued to assign Plaintiff to tasks that Defendant knew or should reasonably have known would aggravate her physical condition.

This instruction correctly stated the law of railroad employer liability under the doctrine discussed above. *See Ybarra v. Burlington N., Inc.,* 689 F.2d 147, 149 (8th Cir.1982); *Nuttall v. Reading Co.,* 235 F.2d 546, 549 (3d Cir.1956); *Waller v. Southern Pac. Co.,* 66 Cal.2d 201, 57 Cal. Rptr. 353, 358–59, 362, 424 P.2d 937, 942–43, 946 (1967).

■ We conclude there is evidence from which the jury could have found that Amtrak breached that duty in the present case. Ms. Fogg testified that she returned to her duties as a customer relations specialist with Amtrak[4] in early January 1986 following back surgery (a lumbar laminectomy). Her duties required that she remain seated at her desk for long hours. Beginning almost at once but especially after an incident in early February when she attempted to move a file cabinet, she experienced increasing pain in her lower back and right leg. She repeatedly informed her supervisors, including Calvin Kraft, of the pain and regularly had to report to the infirmary for rest and medication. She initially requested a "flex" schedule allowing her to leave work earlier in the afternoon to rest in preparation for her long commute home, but the request was denied.[5] Then, after the file cabinet incident, she asked permission to work a reduced three-day workweek until her health recovered and submitted a letter from her neurosurgeon, Dr. Bruce Ammerman, recommending that schedule. According to Ms. Fogg's testimony, corroborated by that of a co-worker, Mr. Kraft promptly rejected the request saying that if Fogg could not work five days a week he would replace

---

**4.** Amtrak makes no claim here that the assignment of work doctrine discussed above applies only to more traditional, industrial-type injuries arising in the railroad context.

**5.** Ms. Fogg testified that although her workday did not formally begin until 9:00 a.m., she was actually at her job at 7:00 a.m. because she commuted with her husband whose workday

began earlier. Consequently, rather than continue to work a ten-hour day, she eventually asked permission to leave work at 3:00 p.m. but her supervisor informed her that a policy decision had been made not to grant any more requests for "flex" time. Nothing in our decision implies that Amtrak was negligent in failing to accommodate this request.

her (or she would "have to quit"). There was also testimony, however, including from Mr. Kraft, that the final decision on such requests was not Kraft's to make and that they should be transmitted to the personnel or medical departments for consideration. As the trial judge correctly summarized this testimony:

> There is evidence from which the Jury might find that Dr. Ammerman's note was presented by Mrs. Fogg to Mr. Kraft. They might find, based on certain versions of the evidence[,] that Mr. Kraft said that he would not permit the Plaintiff to work a shortened work week, that she must work five days or not at all. There. is evidence from which the Jury might find that [that] really was a company policy decision to be made not by Mr. Kraft but by Personnel and/or the Medical Office. That when Mrs. Fogg was told by Mr. Kraft that she would have to work five days or not at all that she then said, well, put the doctor's letter in my personnel file. The Jury might find that she took no further action, although there is evidence from which the Jury might find that had the matter been fully considered by Personnel or Medical Director, possibly they could have worked out an arrangement. The Jury might also find that there was a procedure whereby she could have appealed an adverse decision from Personnel and perhaps on appeal prevail with respect to a three-day work week, but the Jury might find that she avoided further efforts when told by Mr. Kraft, five days or not at all, or words to that effect.

Furthermore, even if the jury inferred from testimony by Amtrak witnesses that, in light of company policy, no such request for part-time work (had Ms. Fogg been encouraged to pursue it further) would have been granted, the jury still could find that the supervisors were negligent in allowing Fogg to continue her duties over a period of months while they were aware she was aggravating her previous injuries. Dr. Hayes, Amtrak's medical director at the time, testified that supervisors were authorized to require a "fitness for duty" examination as a condition of continued work and were obligated "to keep an eye on the physical well being of the employees." The jury could properly infer that, although Amtrak had no duty to approve a shortened workweek, the officials could not simply ignore plaintiff's condition and let her continue performing duties that were visibly beyond her present capacity.

In sum, we do not hold that Amtrak had a duty—under these or any other circumstances—to accede to a request for part-time work. Rather, the instructions and evidence allowed the jury fairly to conclude that plaintiff's supervisors either blocked an avenue by which she could have pursued a possible temporary accommodation to her health recovery at the appropriate level, or at least were negligent in allowing her to continue her duties as before despite their awareness that she was aggravating her previous injuries.[6]

■ We reject as well Amtrak's contention that plaintiff failed to prove causation since she "was the best judge of her condition" and, by continuing work despite her increasing pain, became "the sole cause of her injury." This point was essentially answered by the Supreme Court in *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957):

> Under this statute [the FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Ju-

---

6. Moreover, to the extent the jury may have thought the issue of Amtrak's negligence revolved about its failure to grant plaintiff's request for part-time work, Amtrak is in no position to complain because it affirmatively participated in formulating instructions—and a verdict form—which highlighted the refusal to shorten plaintiff's workweek as a basis for the claim of negligence.

dicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death.

*Id.* at 506–07, 77 S.Ct. at 448–49 (emphasis added; footnotes omitted). Consistent with the statute, see note 3, *supra*, the trial judge submitted the issue of plaintiff's own negligence to the jury with respect to the amount of damages, and the jury reduced the sum it otherwise would have awarded by a proportionate amount.[7]

## II.

■ As indicated at the outset, Judge Webber granted Amtrak's motion *in limine* to bar plaintiff's economic expert from testifying with respect to the 60% of future lost wages that Amtrak was paying Fogg—and would continue to pay her until her retirement—under a long-term disability plan fully funded by Amtrak. In her appeal, plaintiff argues that the judge erred in failing to apply the "collateral source rule" to her receipt of these benefits (as well as health benefits)[8] because the plan did not state in express terms that it was a substitute for liability under the FELA, and thus Amtrak had not manifested the necessary intent to achieve a setoff against any recovery under the statute. We disagree and affirm the judge's ruling.

■ The collateral source rule provides generally that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tort-feasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." RESTATEMENT (SECOND) OF TORTS § 920A(2) (1977).[9] In this case, however, we deal with a statute that specifically addresses the availability of credits or setoffs against judgments under the FELA. Title 45 U.S.C. § 55 provides:

Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: *Provided,* That in any such action brought against any such common carrier under or by virtue of any of the provisions of this chapter, *such common carrier may setoff therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which that action was brought.* [Emphasis added.]

Courts have recognized that the above proviso is written broadly enough to appear to abrogate the common law collateral source rule with respect to the FELA, *e.g., Clark v. Burlington N., Inc.,* 726 F.2d 448, 450 (8th Cir.1984); the language permits the railroad to set off "any sum" it has contributed to "any insurance ... or indemnity" that may have been paid on account of the injury for which the action was brought. The courts, however, have read the words "on account of the injury" to imply "a distinction between payments emanating from a fringe benefit such as a retirement fund or a general hospital and medical in-

---

7. We find no abuse of discretion in the judge's denial of Amtrak's request for a remittitur. *Lacy v. District of Columbia,* 408 A.2d 985, 988 (D.C.1979).

8. At oral argument plaintiff's counsel clarified that her claim on appeal regarding health benefits pertained to the exclusion of evidence of the medical expenses actually incurred as proof of damages. At trial, however, these medical bills (totalling $12,328.75) were never moved into evidence. Nor had they been barred by the trial judge's order excluding testimony by the economic expert, whose report (and proposed testimony) related only to plaintiff's *future* lost ben-

efits based on the cost of current annual health insurance premiums. Consequently, plaintiff has relinquished any claim of application of the collateral source rule to her medical expenses.

9. In *Blake v. Delaware & Hudson Ry.,* 484 F.2d 204, 207 (2d Cir.1973), Judge Friendly noted in his concurring opinion that the collateral source rule has come under increasing criticism, and he found that it had led to a "shockingly unjust" result in that case, in which plaintiff was allowed to recover the bulk of his hospital bills even though they were paid by the railroad and not by him.

surance plan, and payments which the employer has undertaken voluntarily to indemnify itself against possible liabilities under the FELA." *Id.* If the insurance is treated "as a fringe benefit in part compensation for the employee's work," then "it is deemed to come from a source collateral to the employer/tortfeasor rather than from the employer/tortfeasor itself"; but if the insurance "is viewed as a contribution by the employer intended to fulfill FELA obligations, it would appear to fall within the proviso, and setoff should be permitted." *Folkestad v. Burlington N., Inc.,* 813 F.2d 1377, 1381 (9th Cir.1987). A benefit may be excluded from setoff even though, as here, the employer is the sole source of the fund, *Clark,* 726 F.2d at 451; instead, the purpose and nature of the insurance benefits are controlling, *Folkestad,* 813 F.2d at 1383, and for that determination courts look to any collective bargaining agreement between the parties and the text of the insurance or disability plan itself.

In the present case there is no collective bargaining agreement as Ms. Fogg was conceded to be a management employee. The long-term disability plan under which plaintiff receives monthly benefits provides for reductions summarized in the following description furnished Amtrak management employees and accepted by the parties in the trial court as accurate:[10]

**Reduction of Monthly Income Benefit**

Your Monthly Income Benefit will be reduced by the following other income items payable for the same period that Monthly Income benefits are payable.

1. Any periodic cash payments provided on account of your disability:

—under any other group insurance coverage or similar arrangement of coverage for individuals in a group;

—by the Federal Social Security Act, including benefits payable to your dependents on account of your disability;

—by the Federal Railroad Retirement Act or any other state or federal government disability or retirement plan;

—under any Pension Plan with respect to which your employer contributes or makes payroll deductions;

—under any salary or wage continuance plan sponsored by your employer;

—*under or on account of any workmen's compensation or similar law.* [Emphasis added.]

2. Any Federal Old Age Benefits provided under the Federal Social Security Act.

**Provisions Applicable to Social Security, The Railroad Retirement Act and Workmen's Compensation**

\* \* \* \* \* \*

Your Monthly Income Benefit will be reduced by any lump sum payment provided under or on account of any workmen's compensation or similar law on account of your disability, including amounts realized in conjunction with any compromise or release of claim under such law. Any lump sum payment will be considered to have been payable in monthly payments equal to the amount you would have received under the applicable law if there had been no lump sum award, and will reduce Monthly Income benefits until completely exhausted. Any lump sum payment will be considered to have been made solely for loss of income unless you submit evidence to the contrary acceptable to Connecticut General.

The trial judge found the reduction for periodic payments "under or on account of any workmen's compensation *or similar law* " (emphasis added) to be sufficient proof that Amtrak had established the disability plan partly to indemnify itself against liability under the FELA. Plaintiff argues, to the contrary, that in establishing a disability plan with the specified reductions Amtrak must have been aware that the FELA is *not* a workmen's compensation law and, indeed, that Congress has steadfastly refused pleas to substitute such

---

10. The actual disability plan was not provided to plaintiff by Amtrak in discovery and was never made part of the record in this litigation.

a scheme for tort liability under the act. *See Rogers v. Missouri Pac. R.R.*, 352 U.S. at 509, 77 S.Ct. at 450 ("The fact that Congress has not seen fit to substitute [a workmen's compensation] scheme cannot relieve this Court of its obligation to effectuate the present congressional intention ..."). We find this argument unpersuasive. The FELA

> was enacted because the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.

*Id.* at 507–08, 77 S.Ct. at 449 (footnotes omitted). As Prosser has stated:

> The history of the [FELA] since [1943] has been one of gradual but persistent liberalization in the direction of allowing the plaintiff to recover whenever he is injured in the course of his employment, as under a compensation act.... While it is still undoubtedly true that there must be some shreds of proof both of negligence and of causation, and that "speculation, conjecture and possibilities" will not be enough, there appears to be little doubt that under the statute jury verdicts for the plaintiff can be sustained

upon evidence which would not be sufficient in the ordinary negligence action. PROSSER AND KEETON ON TORTS § 80, at 578–79 (1984 ed.). The fact that Congress has declined to go further and abolish fault altogether cannot mask the fact that, for practical purposes, the FELA serves as the workers' compensation remedy for covered railroad employees.[11] *See Clark*, 726 F.2d at 451 n. 2 (long-term disability policy provided for reduction of benefits "by any amount paid or payable to the employee under any Workmen's Compensation ... or similar law (*including*, but not limited to, loss of income payments under the Federal Employer's Liability Act") (emphasis added; original emphasis omitted)). Thus the reference to "similar law" in the present plan is most naturally read to include payments under a law such as the FELA similar in function and design to workers' compensation.[12]

Moreover, characterizing the insurance in this case strictly as a fringe benefit (and hence a collateral source) is inconsistent with the plan's description of itself as equivalent to a "salary or wage continuance plan." An affidavit submitted by Amtrak's director of compensation and benefits stated that plaintiff "remains an Amtrak employee for purposes of benefit administration" and will continue receiving "benefits equal to 60% of her salary" until age 65, after which she will be eligible for "full Amtrak management retirement benefits." There is no practical difference between the income plaintiff is receiving and payments for lost income she otherwise would be entitled to under the FELA.[13]

---

**11.** The Supreme Court long ago held that the FELA is the exclusive means of recovery for injuries suffered by a railroad worker while engaged in interstate commerce. *New York Cent. R.R. v. Winfield,* 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045 (1917). An employee may pursue a remedy under state workers' compensation law only when the FELA is not applicable and does not provide a remedy. *See Rogers v. Consolidated Rail Corp.,* 688 F.Supp. 835 (N.D.N.Y. 1988).

**12.** For the reason stated, we cannot accept the contrary conclusion of the district judge in *Brady v. National R.R. Passenger Corp.,* 714 F.Supp. 601 (D.Conn.1989), interpreting the same policy, that the failure expressly to list the FELA is

decisive because "[t]he FELA is not workmen's compensation." *Id.* at 604.

**13.** Plaintiff argues that the policy language demonstrates that Amtrak meant to indemnify itself against double payments where the employee received *periodic* cash payments from another source, whereas—in plaintiff's words—a FELA award "is usually a one-time lump sum payment received by either achieving a settlement or a jury verdict." But the plan goes on to state that any lump sum payment received, including by "compromise or release of claim," will be considered to have been payable in monthly payments.

The "overall concern of [45 U.S.C. § 55] is that 'an employee be compensated to the full extent of his loss, not that an employer be precluded from indemnifying himself against potential FELA liability as, for instance, by carrying liability insurance coverage.'" *Folkestad,* 813 F.2d at 1380 (quoting *Hall v. Minnesota Transfer Ry.,* 322 F.Supp. 92, 95 (D.Minn.1971)). Stated differently, "Section 55 allows employers to set off money paid to an injured employee because of his or her injury as long as the employer *is not seeking to totally avoid liability."* *Clark,* 726 F.2d at 451 (emphasis added). The trial judge did not err in concluding that Amtrak intended the long-term disability insurance to supplement FELA payments (but not to shield it from liability altogether). Hence the judge properly excluded evidence of the loss of income for which plaintiff was still being compensated.[14]

The judgment of the Superior Court is

*Affirmed.*

ROGERS, Chief Judge, concurring in part and dissenting in part:

I join Part I of the majority opinion in concluding that the jury could properly find that appellant-Deborah Fogg's supervisors were negligent when, with knowledge that it would aggravate her physical condition, they permitted Fogg to continue her duties. I am, however, despite shared concerns about the collateral source rule, unable to join Part II of the majority opinion.

In concluding that Amtrak has manifested its intent to set-off payments under its long-term disability plan against Federal Employers' Liability Act (FELA) recovery, the majority ignores the prevailing analytical framework, disregards the United States Supreme Court's interpretation of the federal statute (*Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)), fails to distinguish a federal court decision dealing with the same disability plan (*Brady v. National R.R. Passenger Corp.,* 714 F.Supp. 601 (D.Conn.1989)), and relies for persuasive authority on the terms of a different disability plan adopted by another railroad (*Clark v. Burlington N., Inc.,* 726 F.2d 448 (8th Cir.1984)). Apparently, the majority, no less than other courts faced with claims under FELA, does not like the collateral source rule, and it is concerned with the result if Fogg had been allowed to introduce evidence regarding 60% of her wages and the employer required to make a double payment. In reaching a conclusion notable for its uniqueness, however, the majority has undertaken a legislative role. In my view, the court is bound, consistent with the statute as interpreted by the federal courts, to hold that Amtrak has failed explicitly to manifest its intent to set-off FELA recovery from payments under its disability benefit plan, and that in view of the overwhelming weight of authority, cannot be deemed to have done so by providing for reduction for "workmen's compensation or similar law." Accordingly, the trial judge erred in granting Amtrak's motion in limine and excluding evidence regarding

**14.** Our dissenting colleague's claim that we have "undertaken a legislative role" by sustaining the judge's ruling misses the mark. It must be kept in mind that we interpret here a statute broadly giving the railroad the right to set off in a FELA action "any sum" it has contributed to "any insurance" paid on account of the injury for which suit has been brought. Only by judicial gloss have courts adopted the "fringe benefit" (collateral source) versus indemnification distinction and the requirement that the employer manifest a clear intent to accomplish the latter. Thus we simply adhere to the apparent legislative intent when we look for *practical* indication that Amtrak intended its disability plan as a supplement to FELA payments, and decline to make the absence of magic words ("Federal Employers' Liability Act") in the plan decisive.

Under the dissent's contrary analysis, however, we would begin with something like a legislative presumption, unsupported by the language of 45 U.S.C. § 55, in favor of double recovery for employee injury (as a "fringe benefit") and require the employer to adduce explicit proof that it did not mean to confer such a double benefit. Though workers' compensation and recovery under the FELA are not identical, the dissent does not adequately explain why the most natural reading of the words "workmen's compensation or similar law" in the plan does not include a FELA cause of action that normally bars resort to workers' compensation, see note 10, *supra,* and features the greatly diminished proof requirements noted by Prosser and the Supreme Court in *Rogers, supra.*

60% of appellant's future lost wages.[1]

Without explanation the majority ignores the requirement imposed by courts interpreting 45 U.S.C. § 55 (1988) that, in order for offset to occur, the employer must explicitly manifest its intent, through the express language of the disability plan, to indemnify itself against FELA liability.[2] This requirement is longstanding and the policy considerations have been long acknowledged by the federal courts. *See, e.g., Blake v. Delaware & Hudson Ry.*, 484 F.2d 204, 205–07 (2d Cir.1973) (and cases cited). In a concurring opinion in *Blake*, Judge Friendly castigated the collateral source rule, noting that it had come under increasing criticism, but acknowledged that "[w]hat constrains me nevertheless to concur [in holding that double payment is required by the employer since the employer had not manifested its intent that the benefits were in the form of an indemnity] is that here we are governed not by federal common law but by statute." *Id.* at 207 (Friendly, J., concurring) (citing *Bangor & Aroostook R. Co. v. Jones*, 36 F.2d 886 (1st Cir.1929)). But he further pointed out that:

> If the railroads wish to avoid the harsh result reached by the district court, they can accomplish this by specific provision in the collective bargaining agreement.

1. I agree with the majority that Fogg has abandoned any claim with respect to medical benefits since the medical bills were never moved into evidence and the trial judge did not exclude testimony regarding these benefits. Majority opinion at 791 n. 8.

2. *See, e.g., Folkestad v. Burlington N., Inc.*, 813 F.2d 1377, 1383 (9th Cir.1987) ("no setoff of benefits can flow from the statute in the absence of a stipulation that the insurance benefits paid to an injured employee are intended to indemnify the employer for FELA liability"); *Clark v. Burlington N., Inc., supra*, 726 F.2d at 451 (allowing for set-off only where plan "explicitly provide[d] that money paid or payable under the FELA decreases the benefits allowable"); *Brady, supra*, 714 F.Supp. at 602 ("The specific provisions of the benefits plan may be determinative of the issue" of offset).

3. "[T]aking the cue" from Judge Friendly, a number of railroads have since 1973 expressly provided for setoff of FELA payments in their collective bargaining agreements. *Folkestad, su-*

Short of this the remedy is for Congress—which would do still better to repeal the outmoded FELA and substitute a liberal plan of workmen's compensation, as it did in 1927 for longshoremen and harbor workers....

*Id.* (citations omitted).[3]

Requiring the collective bargaining agreement or the benefit plan itself to make explicit whether the benefit is a fringe not subject to offset, or an indemnity subject to FELA offset, serves a dual purpose beyond adhering to Congressional intent. It gives the employer some control over the size of the benefit plan that will be available to its employees. It also places employees and potential employees on notice of the sources of income they will receive in the event of injury, and whether they will receive supplement payments under a benefit plan in addition to recovery under FELA. *See Clark, supra*, 726 F.2d at 451. Requiring express language in the benefit plan eliminates any ambiguity, avoids unnecessary litigation, and enables all affected parties to take appropriate action.

Had the majority followed federal precedent it would have had no choice but to conclude that Amtrak had not explicitly manifested its intent.[4] Amtrak's long-term

*pra*, 813 F.2d at 1383; *Clark, supra*, 726 F.2d at 451 n. 3.

4. This was the conclusion reached by the court in *Brady, supra*, 714 F.Supp. at 603, upon examining the same plan at issue here with regard to an employee also not covered by a collective bargaining agreement. The majority rejects *Brady* with little explanation, stating only that Amtrak's plan "is most naturally read" to the contrary. Majority opinion at 793. In *Brady*, the court held that Amtrak had not manifest its intent to offset the long term disability payments against a FELA verdict. The court examined the terms of Amtrak's plan, which specifically offsets payments made under "any workmen's compensation or similar law," as well as *payments under the Social Security Act, and the* Railroad Retirement Act, but makes no reference to FELA. By negative implication, the court held, distinguishing *Clark, supra*, that since no mention was made of FELA, and the policy was drafted according to Amtrak's wishes, Amtrak must not have intended to offset FELA payments. *Id.* at 604. The majority does not, and, in fairness, cannot identify the source of its different reading of the same plan.

disability plan explicitly provides for reduction of benefits paid on account of the Social Security Act, the Federal Railroad Retirement Act, salary or wage continuance plan or "workmen's compensation or similar law." The plan does not expressly provide for offset for payments made on account of FELA. No mention is made of FELA, and, hence, offset should have been denied.[5]

The disability plan's reduction for payments made "under or on account of any workmen's compensation or *similar* law," does not, as the majority contends, manifest Amtrak's intent to indemnify itself against FELA liability. Majority opinion at 793. The majority quotes, but then ignores, the observation by the Supreme Court in *Rogers v. Missouri Pac. R.R.*, *supra*, 352 U.S. at 509, 77 S.Ct. at 450, that "Congress has not seen fit to substitute a [workmen's compensation] scheme" for FELA, majority opinion at 793 (and indeed has amended FELA to strengthen it, 352 U.S. at 508–09, 77 S.Ct. at 450),[6] Rather, the majority concludes that FELA is sim-

ilar in some respects to workmen's compensation, and therefore Amtrak must have had FELA in mind in providing for offset for laws similar to workmen's compensation. In reaching this conclusion, the majority ignores the overwhelming weight of authority.[7]

FELA is not, as the majority asserts, "similar in function and design to workers' compensation." Majority opinion at 793. While both FELA and workmen's compensation statutes have a broad remedial purpose, *see Urie v. Thompson*, 337 U.S. 163, 181–82, 69 S.Ct. 1018, 1030–31, 93 L.Ed. 1282 (1949), the similarities end there. The function of workmen's compensation statutes, unlike FELA, is to make the employer an insurer of the employee's safety regardless of fault by allowing the employee to recover whenever he or she is injured in the course of the employment. *See Gallose v. Long Island R.R.*, 878 F.2d 80, 85 (2d Cir.1989) ("FELA was never intended to hold an employer absolutely liable for workplace injuries."); *Conway v. Consolidated Rail*, 720 F.2d 221, 223 (1st Cir.

---

**5.** If Amtrak intended to offset FELA benefits, nothing prevented them from taking the cue from Judge Friendly and others, and making that explicit in the plan itself, as other railroads have done. At oral argument, counsel for Amtrak could not explain why Amtrak had not inserted in its benefit plan a statement which would reduce FELA recovery from payments made under the plan. Amtrak's failure to do so when they were on notice that there was a problem and had the power to insert such a provision can only lead to the inference that they did not intend to provide for FELA offset. *See Brady, supra*, 714 F.Supp. at 604 ("[i]t is difficult to imagine that the railroad [Amtrak], whose familiarity with the FELA must be presumed, would employ such an ambiguous device to protect itself from double liability under the FELA. If it intended that the FELA payments be set off against the benefits provided for in the plan, it should have said so in the plan").

**6.** The full *Rogers* quote, which bears repeating is:

Cognizant of the duty to effectuate the intention of Congress to secure the right to a jury determination, this Court is vigilant to exercise its power of review in any case where it appears the litigants have been improperly deprived of a determination. Some say [FELA] has shortcomings and would prefer a workmen's compensation scheme. The fact

that Congress has not seen fit to substitute that scheme cannot relieve this Court of its obligation to effectuate the present congressional intention by granting certiorari to correct instances of improper administration of the Act and to prevent its erosion by narrow and niggardly construction.

352 U.S. at 509, 77 S.Ct. at 450 (footnote omitted).

**7.** The majority relies on *Clark, supra*, 726 F.2d at 451 n. 2, to suggest that the court there held that FELA serves as the workers' compensation statute for railroad workers. See majority at 793 (quoting Burlington Northern's long-term disability plan, which provided for reductions for benefits "by any amount paid or payable to the employee under any Workmen's Compensation ... or similar law (*including*, but not limited to, loss of income payments under the Federal Employer's Liability Act") (emphasis supplied by majority opinion). The court in *Clark* made no such holding. Rather, the policy there expressly provided for offset for FELA recovery and, as a result, the court held that Burlington Northern had made its intent clear. The majority here is, in effect, relying on the fact that Burlington Northern interpreted FELA in its own plan to be a "similar law" to workmen's compensation. This has no relevance here where the issue is not Burlington Northern's interpretation of its plan, but whether Amtrak has explicitly manifested its intent.

1983) ("It is *black letter law* that an [sic] FELA plaintiff is not entitled to absolute security; the act, unlike workmen's compensation statutes, does not make the employer an insurer.") (emphasis added), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1911, 80 L.Ed.2d 459 (1984); *Padgett v. Southern Ry.*, 396 F.2d 303, 306 (6th Cir.1968) (FELA "does not contemplate absolute elimination of all dangers, but only the elimination of those dangers which could be removed by reasonable care on the part of the employer"). Under workmen's compensation statutes an employee is automatically entitled to benefits upon being injured on the job. FELA's function, by contrast, is not to provide the employee with such absolute security on the workplace, but only with freedom from those hazards that are the fault (in some respect) of the employer:

> The [FELA] was enacted because Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.

*Rogers, supra*, 352 U.S. at 507–08, 77 S.Ct. at 449; *See* S.REP. No. 460, 60th Cong., 1st Sess. 2–3 (1908).

In addition, FELA's design is completely different from the procedures which exist under workmen's compensation schemes. The administration of these schemes are usually in the hands of an administrative body, and rules of procedure and evidence are relaxed. *See* 1A A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 1.10 (1990). Workmen's compensation schemes compute the appropriate level of compensation by a rigid formula which takes into account only two factors: the severity of the disability and the economic loss incurred as a result of the injury. *See* 2 A. LARSON, *supra*, Ch. X (1989). Recovery for pain and suffering is generally not allowed. *Id.* Contrary to the majority's observation, majority opinion at [15], therefore, even for "practical purposes" FELA and workmen's compensation are not the same: "[i]n many cases, compensation awards are less than jury awards would be in a comparable situation." Murphy, *Sidetracking the FELA: The Railroads' Property Damage Claims*, 69 MINN. L.REV. 349 (1985). Consequently, it is difficult to discern a rational basis for the majority's conclusion that FELA is similar law to workmen's compensation, particularly in view of long-standing federal precedent decrying the collateral source rule as applied to FELA and urging Congress to replace it with a workmen's compensation law. *See, e.g., Blake, supra*, 484 F.2d at 206 (and cases cited).

Finally, there is nothing to support the majority's conclusion that Amtrak's intent to treat its disability plan as an indemnity is evidenced by the plan's provision for a reduction for benefits paid out under a "salary or wage continuance plan." According to the majority, this provision indicates that Amtrak treats its disability plan as equivalent to a salary or wage continuance plan, and since salaries and wages are not in the form of "fringe benefits," but ordinary compensation, the disability plan is not a "fringe," but an indemnity. Majority opinion at 793. The record reflects no "equivalence" between the disability plan and a salary or wage plan. Nor is there evidence that under a disability plan and a salary or wage plan the employee would receive the same compensation. In addition, the disability plan is based on the employee being disabled, while (in the absence of evidence to the contrary) a wage or salary plan is based on different assumptions and contains no such requirement.

In sum, the majority has rejected long-standing precedent in favor of speculation about Amtrak's intent.[8] Its decision has

---

**8.** Indeed, Amtrak's listing in its benefits plan of federal statutes under which payments will be deducted, see majority opinion at 792, is, under the majority's interpretation of "or similar law,"

the potential for upsetting expectations under existing employment contracts based on long-settled federal law. Accordingly, I dissent from Part II of the majority opinion.

---

superfluous since any recovery for an injury will be deemed in the nature of an indemnity. The majority concedes, moreover, that it relies for its statutory interpretation on "apparent legislative intent," majority opinion at n. 14, with nary a reference to the legislative history of FELA.